521 F.2d 448
 Thomas I. FITZGERALD, Public Administrator of the County of
New York, Administrator of the Estate of Hagen
Pastewka, Deceased and Monica Pastewka,
Individually, Plaintiffs-Appellants,
v.
TEXACO, INC., and Texaco Panama, Inc., Defendants-Appellees,
and ConsolidatedCases.
 Nos. 195, 205, Dockets 74-1958, 74-1468.
 United States Court of Appeals,
Second Circuit.
 Argued April 2, 1975.
Decided June 25, 1975.
As Modified on Denial of Rehearing July 25, 1975.
Certiorari Denied Jan. 12, 1976.
See 96 S.Ct. 781.
 
 MacDonald Deming, New York City (Haight, Gardner, Poor & Havens, and Emil A. Kratovil, Jr., New York City, on the brief), for appellants Hapag-Lloyd, A. G., and Stork Amsterdam N. V., and others.
 Harvey Goldstein, New York City (Fuchsberg & Fuchsberg, New York City, on the brief), for appellant Thomas I. Fitzgerald, as Administrator for Estate, etc.
 Alvin L. Stern, New York City (Poles, Tublin, Patestides & Stratakis, Melvin J. Tublin and John J. Devine, Jr., New York City, on the brief), for appellees Texaco Inc. and Texaco Panama Inc.
 Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.
 ROBERT P. ANDERSON, Circuit Judge:
 
 
 1
 On January 12, 1971, the M/V Brandenburg, a German vessel, struck the wreckage of the S/T Texaco Caribbean, a Panamanian vessel, owned by Texaco Panama, Inc. (Texpan), a foreign subsidiary of Texaco, Inc. (Texaco), in the Dover Straits 12 miles from the coast of England, where the Texaco Caribbean lay submerged as a result of a collision the previous day with the M/V Paracas, a Peruvian vessel. Suits were brought in the Southern District of New York by Hapag-Lloyd, A.G., and Stork Amsterdam N.V. Industrias Lacteas Dominicanas, S.A., et al., foreign corporations, against Texaco under general maritime law for the loss of the Brandenburg and her cargo, respectively, and by 12 estates of deceased German seamen, through the Public Administrator of the County of New York, against Texaco and Texpan under the general maritime law and the Death on the High Seas Act, 46 U.S.C. § 761 et seq. The claims were based on defendants' alleged failure properly to mark the wreckage of the Texaco Caribbean.
 
 
 2
 The defendants filed a motion to dismiss these actions which was granted by the district court under the doctrine of forum non conveniens upon the recommendation of the magistrate to whom the motion had been referred. The dismissal was subject, however, to the conditions that the defendants submit to the jurisdiction of the courts in England, where Texpan and several of the present plaintiffs, among others, are parties in pending suits arising from the same series of events, and that the defendants waive any defense of a statute of limitations which they might have there.[1]
 
 
 3
 The evidentiary material, submitted by the parties, disclosed the following undisputed facts. Texaco Overseas Tankships Limited (TOT), a British subsidiary of Texaco which managed the Texaco Caribbean for Texpan, notified Trinity House, a British corporation with the statutory duty of locating and marking wrecks off the coast of England, of the collision between the Paracas and the Texaco Caribbean, while the stern section of the latter was then still afloat, and requested that action be taken to mark the area. In response thereto, Trinity House dispatched its ship Siren to the scene, but by the time she arrived, the stern section of the Texaco Caribbean had sunk. The Siren mistakenly moored at the edge of an oil slick which she assumed indicated the location of the wreck and warned other vessels to avoid that area. Later, members of the crews of two British fishing vessels saw the Brandenburg run into the wreck of the Texaco Caribbean which was actually located about a mile from the Siren's anchored position. This occurred about 0730 on January 12, 1971. The Brandenburg sank immediately.
 
 
 4
 Prospective witnesses, such as employees of TOT, surviving crew members of the Texaco Caribbean, who are Italian nationals, employees of Trinity House, and the English crew members of the fishing vessels, all reside in or near England.
 
 
 5
 The plaintiffs had served numerous interrogatories and requests for the inspection of certain documents upon Texpan's counsel before responding to the motion to dismiss, but the district court issued a protective order limiting discovery to what in its opinion might disclose the location of important sources of proof.
 
 
 6
 In response to the interrogatories allowed, Texpan stated that TOT had exclusive authority under the Ship Management Agreement to take all necessary action to mark the wreck of the Texaco Caribbean, and that no one residing in the United States had been consulted about the operation.
 
 
 7
 Plaintiffs, nevertheless, still claimed that Texaco had supervised the search operation from New York, and many of the witnesses and documents, which were essential to the proof at the trial, were there; and that, therefore, trial in New York would best serve the convenience of the parties. The evidentiary material offered in support of their contention was, however, of insubstantial value. It consisted of a copy of an inter-office memorandum written by an employee of Smit-Tak, a Dutch company operating a fleet of wreck-search vessels, which stated that Smit-Tak had offered its services to TOT on the day of the Paracas collision, but that TOT had replied that it could not hire Smit-Tak without authorization from Texaco's New York office. Plaintiffs also served a notice to admit that a Texpan official had signed a letter in 1967 (four years before the occurrences in the present case), written on Texpan stationery bearing a New York address, and further proposed to take depositions of Texpan officials regarding matters which had already been covered in the interrogatories and affidavits but the district court issued a protective order barring both the notice to admit and the additional discovery. This appeal followed.
 
 
 8
 The sole issue presently before this court is whether or not the district court abused its discretion in granting the motion to dismiss the action on the ground of forum non conveniens.
 
 
 9
 An action may properly be dismissed under the doctrine of forum non conveniens when the convenience of the parties and the ends of justice weigh heavily against the retention of jurisdiction. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507-8, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 645-6 (2 Cir.), cert. denied,352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). Another factor to be considered is the public interest which includes a limitation on the use of a local forum for resolution of controversies which lack significant local contacts, especially when trial of the action would create administrative and legal problems for the courts. Gulf Oil Corp. v. Gilbert,supra, 330 U.S. at 508, 67 S.Ct. 839. This is not a case where the plaintiffs or any of them has a "home jurisdiction" in the Southern District of New York. Koster v. Lumbermens Mutual Co., 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Although plaintiffs should rarely be deprived of the advantages of their chosen forums, "the doctrine leaves much to the discretion of the court,"[2] whose decision, absent a clear showing of abuse of discretion, may not be disturbed. Fitzgerald v. Westland Marine Corp., 369 F.2d 499, 502 (2 Cir. 1966).
 
 
 10
 Among the major factors bearing on the convenience of the parties are ease of access to sources of proof, the availability of compulsory process and the cost of obtaining willing witnesses. Gulf Oil Corp. v. Gilbert, supra, 330 U.S. at 508, 67 S.Ct. 839, Fitzgerald v. Westland Marine Corp., supra, at 501.
 
 
 11
 Even on the plaintiffs' statement of the facts, the convenience to all parties of trying these cases in the English courts and the vast inconvenience to all of trying the cases in New York, overwhelmingly outweighs the temporary convenience to the plaintiffs of getting access to evidentiary material in Texaco's possession in New York.[3]
 
 
 12
 What the plaintiffs want to prove is that TOT could make no move with regard to buoying the wreck of the Texaco Caribbean or otherwise take steps to warn mariners of the obstruction without orders from Texaco in New York. But TOT is in England and its officers and records are there. Moreover, Texaco does business in England. The plaintiffs should find their best proof right there, not only with regard to Texaco but also as to any liability on the part of Texpan. In fact, the plaintiffs' cases on liability will depend in large measure upon the knowledge and activities of such witnesses as the employees of TOT and Trinity House, who are not parties to this litigation, but who directly participated in the events which gave rise to it. The United States District Court in New York, however, has no power to subpoena any of these witnesses.[4] It is unlikely that many would be willing to travel to New York to testify; and the cost, in any event, would be prohibitively great. Those witnesses who reside in England are subject to the compulsory process of her courts; and the others, if willing to testify, could do so there at reasonable expense.
 
 
 13
 The plaintiffs, moreover, will not be significantly inconvenienced by dismissal. The district court granted the motion on the express condition that Texaco submit to the jurisdiction of the courts in England where, upon court order, personnel will be available to testify and necessary documents may be produced. As the real parties in interest are either German citizens and residents or foreign corporations, it appears that a trial in England, where several are already parties to related suits, would be considerably less burdensome than a trial in New York. The balance of convenience under these circumstances clearly tips in favor of dismissal.
 
 
 14
 Liability for a collision on the high seas between vessels flying different flags is determined according to the general maritime law as interpreted by the courts of the forum in which the action proceeds. The Scotland, 105 U.S. 24, 29, 26 L.Ed. 1001 (1881); The Belgenland, 114 U.S. 335, 369, 5 S.Ct. 860, 29 L.Ed. 152 (1885); Kloeckner Reederei v. A/S Hakedal, 210 F.2d 754, 756 (2 Cir. 1954), cert. dism., 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1955); Pacific Vegetable Oil Corp. v. S/S Shalom,257 F.Supp. 944, 946 (S.D.N.Y.1966). England apparently accepts this doctrine. The Buenos Aires, 5 F.2d 425, 437 (2 Cir. 1924).[5] Plaintiffs claim that the difference between the interpretation by the English and American courts of general maritime law might adversely affect their chances of prevailing on the merits, and that "the ends of justice" require that they be allowed to retain the advantageous interpretations of the law made by their chosen forum, even if, under all the other criteria, that forum is an inconvenient one.
 
 
 15
 Plaintiffs cite The Utopia, 18 A.C. 492 (1892), and The Douglas,7 P.D. 151 (1882), as authority for the proposition that, under general maritime law as applied by the courts in England, the duty of an owner ceases as soon as he notifies a governmental agency of the wrecking of his vessel and requests that the government, or its agency, take action to locate and mark the wreck. As a result, plaintiffs argue that defendants would be entitled to judgment as matter of law in England merely because TOT had asked Trinity House to locate and mark the wreck of the Texaco Caribbean; whereas they claim in the United States the critical issue is whether an owner took all reasonable precautions to prevent injury to another.[6]
 
 
 16
 A district court has discretion to dismiss an action under the doctrine of forum non conveniens, however, even though the law applicable in the alternative forum may be less favorable to the plaintiff's chance of recovery. Canada Malting Co., Ltd. v. Paterson Steamships, 285 U.S. 413, 418-20, 52 S.Ct. 413, 76 L.Ed. 837 (1932). A contrary holding would emasculate the doctrine, for a plaintiff rarely chooses to bring an action in a forum, especially a foreign one, where he is less likely to recover. But the issue remains one of balancing the relevant factors, including the choice of law.
 
 
 17
 Any difference between the general maritime law as interpreted and applied in the United States and England would affect plaintiffs' rights of recovery only if it could be shown that TOT had negligently failed to take some action which would have prevented the Brandenburg from running into the wreck of the Texaco Caribbean after TOT had notified Trinity House of the collision.
 
 
 18
 It is undisputed that defendants would have claims over against the owners of the Paracas and Trinity House, presently parties to the suits in England, for any recovery which plaintiffs may secure in those actions. It is also undisputed that these third parties are beyond the jurisdiction of the United States District Court. The inability to implead other parties directly involved in the controversy is a factor which weighs against the retention of jurisdiction in the Southern District of New York. Gulf Oil Corp. v. Gilbert, supra, 330 U.S. at 511, 67 S.Ct. 839; Fitzgerald v. Westland Marine Corp., supra, 369 F.2d at 501-02.
 
 
 19
 And although the occurrence took place on the high seas, over which all nations share suzerainty, England clearly has the more direct interest in promulgating and enforcing rules for the safe passage of traffic in the English Channel.
 
 
 20
 Weighing the minimal possibility that plaintiffs might be adversely affected by dismissal, against the clear prejudice which defendants would suffer if jurisdiction were retained, together with considerations of the public interest, and the factors of convenience, we are satisfied that the district court did not abuse its discretion in this case.
 
 
 21
 It is finally argued that the English courts may choose to apply Lord Campbell's Act rather than the Death on the High Seas Act and that dismissal was, therefore, improper because it might deny relief to certain claimants who would otherwise have a right to recover.
 
 
 22
 Under § 1 of the Death on the High Seas Act, 46 U.S.C. § 761, a suit for damages for wrongful death may be maintained "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative." Under Lord Campbell's Act, on the other hand, "dependent relatives" are not included. 28 Halsbury's Laws of England (3d ed.) 37. But the likelihood that there are any beneficial claimants who would have been entitled to recover in the district court but who will not qualify for recovery in the English courts is conjectural at best.
 
 
 23
 The broad principles of choice of law established for Jones Act cases in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), were declared equally applicable to cases arising under the general maritime law in Romero v. International Operating Co., 358 U.S. 354, 381-4, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and have been applied to suits brought under the Death on the High Seas Act. Symonette Shipyards Ltd. v. Clark, 365 F.2d 464 (5 Cir. 1966).
 
 
 24
 The governing principle winnowed from these cases is that the plaintiffs can recover under the Death on the High Seas Act only if they are able to establish some significant national contacts warranting the application of the statute to non-resident aliens. Lauritzen v. Larsen, supra, 345 U.S. at 582-592, 73 S.Ct. 921. The only American contact in this case is Texaco's alleged supervision of the search.
 
 
 25
 And, although plaintiffs have failed to establish by competent authority the law of the foreign forum, it appears that Lord Campbell's Act applies only when the parties or vessels are British, and, that the English courts otherwise apply the law of the forum with the most significant contacts. 7 Halsbury's Laws of England (3d ed.) 88.
 
 
 26
 The judgment of the district court is affirmed.
 
 MANSFIELD, Circuit Judge (concurring):
 
 27
 In concurring in Judge Anderson's carefully considered opinion, I do not disagree with that part of Judge Oakes' dissent which suggests that the doctrine of forum non conveniens must be administered in a manner that will take into consideration the increased speed of travel, ease of communication and new types of sea transportation associated with the jet and satellite era in which we now live, as well as changing national and international concepts regarding territorial oceanic claims. Even after making due allowance for these new factors, however, I am satisfied that the principles of Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), should they be modified as urged by the dissent, would still mandate an affirmance in this case.
 
 
 28
 The accident occurred right off the British coast, where the scene may be viewed with relative ease by the English court. The key witnesses are located in England and cannot be subpoenaed to appear in New York. Texaco, on the other hand, will be subject to the jurisdiction of the English courts and the defendants may in England assert claims over against Paracas and Trinity House, which they could not do in New York. Furthermore, the overwhelming majority of the other witnesses and real parties in interest (German, Dutch and Italian) are located much closer to England than to the United States.
 
 
 29
 With all major indicators thus pointing to England as the logical forum even in this jet age, the plaintiffs should not be permitted to insist upon our retaining jurisdiction merely because of the possibility that our federal courts might interpret general maritime law more favorably to their cause or award more liberal damages to them than would the High Court of England.
 
 OAKES, Circuit Judge (dissenting):
 
 30
 We are dealing here with a transitory action, a collision occurring on the high seas, albeit in the English Channel, between vessels of foreign registry, with foreign nationals as plaintiffs. As such we have jurisdiction. The Belgenland, 114 U.S. 355, 361-69, 5 S.Ct. 860, 29 L.Ed. 152 (1885). While the case may, and in this dissent will, be dealt with in the traditional terminology of forum non conveniens doctrine, it would be well in applying that doctrine here to sweep away some of the cobwebs that fill the attic of admiralty law and hence, with all respect, the majority opinion which speaks strictly within that traditional terminology. In admiralty law the Supreme Court seems to be suggesting that some of those cobwebs need cleaning out. See United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (divided damages rule replaced by allocation according to comparative fault); Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (seaman's estate could maintain wrongful death action although death occurred on navigable state waters and state law had no provision for death action based on unseaworthiness, overruling The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886)).
 
 
 31
 One cobweb is the myth of registry. While the M/V Texaco Caribbean, whose unmarked wreck evidently caused the loss of life and property here involved, flew the Panamanian flag, it did so purely as a matter of legal and tax convenience to its owners. It was owned in name by a wholly owned Panamanian subsidiary, Texaco Panama, Inc. (Texpan), of Texaco, Inc., an American multinational corporation. While the fiction of corporate entity is given much credence in the admiralty law, e. g., Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), the courts have disregarded it where necessary to avoid evasion of obligations under American law, Zielinski v. Empresa Hondurena de Vapore, 113 F.Supp. 93 (S.D.N.Y.1953) (application of Jones Act to foreign shipowner where foreign seaman resident in United States and stock of foreign shipowner owned by United States corporation), or to promote public policy, United States v. Ira S. Bushey & Sons, Inc., 363 F.Supp. 110 (D.Vt.), aff'd, 487 F.2d 1393 (2d Cir. 1973), Cert. denied, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974) (environmental protection of American lake). See also Gerradin v. United Fruit Co., 60 F.2d 927 (2d Cir.), cert. denied, 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556 (1932); G. Gilmore & C. Black, The Law of Admiralty 388 et seq. (1957). Here the principal place of business of the parent corporation, Texaco, Inc., is in New York City, in the Southern District of New York. The nominal owner Texpan is a wholly owned and controlled subsidiary. While appellees assert that the Texaco Caribbean was managed and operated by Texas Overseas Tankship Limited (TOT), an English corporation, that too is a wholly owned subsidiary of Texaco, Inc. Moreover, legitimately seeking discovery that has been denied, appellants assert that "the seat of final corporate authority of Texpan is in New York" and that "vital decisions with regard to the (locating and marking of) the wreck of the Texaco Caribbean were made there by Texpan personnel."[1] I would for purposes of this case disregard the flag of convenience.
 
 
 32
 The second "cobweb in the attic" does not relate to admiralty alone, but to the entire doctrine of forum non conveniens. The almost 30 years that have elapsed since Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), have seen such an extraordinary development of worldwide economical air travel by jet that the deposing of witnesses abroad or bringing them to the United States is a relatively simple and inexpensive matter in a suit of this size.[2] In other words, in the year 1975 no forum is as inconvenient as it was in 1947. One may wonder whether the entire doctrine of forum non conveniens should not be reexamined in the light of the transportation revolution that has occurred since then.[3]
 
 
 33
 A third cobweb, I fear implicit in the majority opinion if not the entire law of admiralty (but visualized in the last few years, if not yet articulated by the Supreme Court), is the tendency to view shipping on the high seas as if it were still being conducted by sailing vessels in times gone by, rather than by supertankers and other huge, speedy, modern steel behemoths, whose control is more difficult to exercise, whose wrecks are more hazardous, and whose overall dangers to life, limb, property and environment are greater than anything dreamed of, say, when the Privy Council (House of Lords) sat on The Utopia (1893) A.C. 492. So, too, has the entire concept of national suzerainty over international waters changed. In the search for oil, fish and other ocean resources three-mile limits have become 12 and are being claimed at 200 miles; are we to transfer to Ecuador, for example, cases involving collisions near its limits? See generally United States v. Maine, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975). More to the point, Brittania no longer rules the waves, and while England (as well as France and Holland) has a territorial and environmental interest in connection with the English Channel, outside the three-mile limit that strait is international water, a tremendously busy commercial shipping lane for European common market and other traffic; as such, it cannot any longer be said, as the majority says, "England clearly has the more direct interest in promulgating and enforcing rules for safe passage" through the Channel. In this connection, it is interesting to note that the two ships wrecked here were Panamanian and West German, the modern well-equipped wreck search and salvage vessel (The Orca) that might have marked the wreck of the Texaco Caribbean was Dutch, and the only witness ship,[4] the Leslie Lykes, which stood by for hours as the Texaco Caribbean's stern section slowly sank, was a United States flag freighter.
 
 
 34
 I come then to the traditional doctrine of forum non conveniens which with or without cobwebs I still believe to be inapplicable to this case. Mr. Justice Jackson's exegesis in Gulf Oil Corp. v. Gilbert, 330 U.S. at 508, 67 S.Ct. 839 at 843, sets forth the principal factors to consider, each of which I will treat the "practical problems that make trial of a case easy, expeditious and inexpensive" (ease of access to sources of proof, availability of compulsory process, cost of obtaining willing witnesses' attendance, availability of view, etc.); questions of enforceability of a judgment; "relative advantages and obstacles to fair trial." "But," he cautioned, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Id.
 
 
 35
 Justice Jackson also mentioned the "public interest" factors court congestion, jury duty, the local interest in having localized controversies decided at home, the advantage of having the local law to be applied applied by a court most familiar with it. 330 U.S. at 508-09, 67 S.Ct. 839. But as stated by Judge Goodrich in All States Freight, Inc. v. Modarelli, 196 F.2d 1010, 1011 (3d Cir. 1952), quoted in Norwood v. Kirkpatrick, 349 U.S. 29, 31, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955), the
 
 
 36
 doctrine involves the dismissal of a case because the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else.
 
 
 37
 Here the private "practical" considerations seem to me to weigh in favor of trial here, as opposed to England. Texaco, Inc., has offices in New York, where its corporate and intercorporate records, communications with Texpan and TOT and officers are located. Texpan's offices, according to its answers to interrogatories, are in Panama (closer to New York than to London) and TOT's offices are in Monte Carlo and London, the managers in both offices claimed by Texpan to have been empowered to decide salvage, location and marking questions regarding the Texaco Caribbean. The witnesses would include the surviving crew members of the Texaco Caribbean who are Italian nationals; employees of TOT, Trinity House, two British fishing vessels and employees of two coastal radio stations, who are English; the crew of the Leslie Lykes who are American and who are especially important (See majority footnote 4); the surviving crew members of the Brandenburg and death claimants who are German; the officers and crew of the Orca, the Dutch salvage ship, and its owners, who are Dutch. With all of these people located in different places, while there might be some slight balance in favor of trial in England, can it be said to be so great as to require dismissal here?
 
 
 38
 There is no question of enforceability of any judgment that might be obtained. There is a practical problem urged by appellees that there might be a judgment here inconsistent with some judgment that might be rendered in the English courts in the litigation there instituted, involving claims by the owners of the Brandenburg and its cargo against the Texaco Caribbean, the Paracas (which has also claimed against and is claimed against by the Texaco Caribbean for the initial collision) and Trinity House. But the death claimants are not before the English courts, the interest of Trinity House with a liability limitation of $80,000 is comparatively minimal, and the fact that the Paracas or its owners are not subject to American jurisdiction is immaterial to the suits here, based on failure of the Texaco interests to mark the wreck of their tanker. As for the overall advantages or obstacles to a fair trial, except for the apparent status of the English law against the appellants here, mentioned below, they appear to be in equipoise.
 
 
 39
 The public interest factors do not seem to me to support the majority decision, either. The docket of the Southern District is not relied upon. There is no local interest to be served in this international litigation, in England or elsewhere, other than the basic interest of the United States in exercising jurisdiction to avoid a failure of justice. See Gkiafis v. S. S. Yiosonas, 387 F.2d 460, 464 (4th Cir. 1967); Heredia v. Davies, 12 F.2d 500, 501 (4th Cir. 1926). See The Belgenland, 114 U.S. at 367, 5 S.Ct. 860;[5] Motor Distributors, Ltd. v. Olaf Pedersen's Rederi A/S, 239 F.2d 463, 465 (5th Cir.), cert. denied, 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957).
 
 
 40
 There is, moreover, a very grave danger that appellants will be precluded from recovery under the English law as set forth in The Utopia, supra, and The Douglas (1882) 7 P.D. 151, where the House of Lords and Court of Appeals respectively held that mere notice to governmental authorities relieves the owner of a wreck from liability: "This circumstance (report of the collision to the harbor-master) exonerates the defendants from the charge of negligence, for it gave the harbor-master notice to perform the duty." 7 P.D. at 161. Contrast this with Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665, 669 (2d Cir. 1951) ("the mere fact that the Coast Guard undertakes a search does not relieve the owner of liability for failure to make all reasonable efforts to mark"). See also Morania Barge No. 140, Inc. v. M. &. J. Tracy, Inc., 312 F.2d 78, 83 (2d Cir. 1962). While the majority's purported distinction of The Utopia and The Douglas in majority footnote 6 (on the basis that the authorities had assumed complete physical control of the wrecks) is possibly sound, we have no reason to believe that it will necessarily be followed by the English courts, much less any reason to think that English courts will apply some version of the general maritime law other than its own. See The Scotland, 105 U.S. 24, 29-30, 26 L.Ed. 1001 (1881). Limitation upon or denial of recovery is in and of itself grounds for not dismissing on forum non conveniens grounds. Bickel, Forum Non Conveniens in Admiralty, 35 Cornell L.Q. 12 (1949).
 
 
 41
 In short, the considerations toward which Gulf Oil Corp. v. Gilbert directs us do not call for dismissal here; justice on the contrary requires that we retain jurisdiction in the American courts where suit was brought. And, if we look at this litigation in the light of the considerations of 1975, not through the cobwebs of the law of half a century or a century ago, what may otherwise be a relatively close case becomes, for me, one that is clear-cut.[6] It is important to world commerce that our courts of admiralty remain open to would-be litigants. The majority decision today shuts them for tenuous and in my view insubstantial reasons.
 
 
 
 [1]
 It is undisputed that the following legal actions are pending in England: (1) owners of the Brandenburg's cargo against the Paracas, Texaco Caribbean, and Trinity House; (2) Texaco Caribbean against the Paracas; (3) the Paracas against Texaco Caribbean; and (4) the Brandenburg against Trinity House
 There are also pending in the United States District Court for the District of Delaware 12 suits, similar to those brought in this court, against Texaco and Texpan by the heirs and representatives of the deceased German seamen.
 
 
 [2]
 Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)
 
 
 [3]
 Plaintiffs argue that the district court prevented them from adequately demonstrating that Texaco had directed the search. Because we hold that the convenience of the parties favors dismissal under either version of the facts, plaintiffs were not prejudiced by the limitations imposed by the district court upon the scope of discovery
 The grant and nature of protection with respect to discovery is within the discretion of the trial court, Galella v. Onassis, 487 F.2d 986, 997 (2 Cir. 1973), and we find that the district court did not abuse its discretion by issuing the protective orders in this case. The general standard is that parties are entitled to obtain discovery regarding any matter which is relevant to the subject matter involved in the pending action. F.R.Civ.P. 26(b)(1). The discovery and disclosure at issue sought the substance of all reports made by employees of TOT, and all requests made by Texpan to locate or mark the wreck; also requests were made for copies of all documents prepared by any survivors of the Texaco Caribbean, and for copies of reports upon any investigation "into any of the circumstances relevant to the collision." But a motion to dismiss for forum non conveniens does not call for a detailed development of the entire case; rather discovery is limited to the location of important sources of proof. It is undisputed that the proposed depositions dealt with topics for which full information was already available. Nor did the district court in this case abuse its discretion, on this motion to dismiss for forum non conveniens, in failing to require detailed disclosure by the defendants of the names of their proposed witnesses and the substance of their testimony.
 
 
 [4]
 The only prospective witnesses who reside in the United States, and who are not parties, are the members of the crew of the Leslie Lykes, most of whom reside in Florida, and who observed the Paracas collision and could testify that the stern section of the Texaco Caribbean remained afloat for several hours and that her wreckage, therefore, could have been properly marked by the fully-equipped Smit-Tak vessel patrolling in the area. These crew members, except for the unlikely chance that the Leslie Lykes were to stop in New York, which it has not done, however, since 1966, would not be subject to subpoena in New York and their testimony would have to be taken by depositions. The surviving crew members of the Texaco Caribbean, who reside in Italy, presumably could provide similar testimony and many of these witnesses will be present in England in connection with the trials of the related suits there pending
 
 
 [5]
 "The high seas . . . are subject to the jurisdiction of all countries . . . The question of negligence in a collision raised in a suit in this country is to be tried, not indeed by the common law of England; but by the maritime law which is part of the common law of England as administered in this country." Chartered Mercantile Bank of India v. Netherlands India Steam Navigation Co., 10 Q.B.D. 521, 537 (1883). See, 7 Halsbury's Laws of England (3d ed.) 87-88
 
 
 [6]
 The district court made no finding as to whether the duty of an owner to mark the wreckage of its vessel does in fact differ under general maritime law as presently applied by the English and American courts. The plaintiffs cited The Utopia and The Douglas and their own interpretations of them as sole authority for the English law. But the collisions at issue in The Utopia and The Douglas occurred after the port authority had assumed complete physical control of the wrecks and both cases clearly state that, until the port authority had assumed physical control, the owners had a duty to take all reasonable steps to protect other vessels from running afoul of the wrecks
 "The result of these authorities (citing The Douglas among others) may be thus expressed.
 The owner of a ship sunk whether by his default or not . . . has not, if he abandon the possession and control of her, any responsibility either to remove her or to protect other vessels from coming into collision with her. It is equally true that so long as, and so far as, possession, management, and control of the wreck be not abandoned or properly transferred, there remains on the owners an obligation in regard to the protection of other vessels from receiving injury from her. But in order to fix the owners of a wreck with liability two things must be shown, first, that in regard to the particular matters in respect of which default is alleged, the control of the vessel is in them, that is to say, has not been abandoned, or legitimately transferred, and, secondly, that they have in the discharge of their legal duty been guilty of wilful misconduct or neglect." The Utopia, 18 A.C. 492, 498 (1892).
 Although it may be possible to argue that mere notice to the port authority constituted transfer of control, sufficient to relieve the owner of liability, the explicit rationale for the rule given by the court in The Utopia was that "it would be dangerous if an owner of a wreck were compelled, in order to avoid a personal responsibility, to interfere with the action taken by a public authority." 18 A.C. at 499. This obviously assumes that mere notice is not enough and an owner is only relieved of responsibility after the public authority has taken action to take over the marking of the wreck.
 The courts in the United States, several of which have cited The Douglas and The Utopia with approval, have similarly recognized that an owner's duty to mark a wreck ceases once the Coast Guard has undertaken the task. The Plymouth, 225 F. 483 (2 Cir.), Cert. denied, 241 U.S. 675, 36 S.Ct. 725, 60 L.Ed. 1232 (1915); New York Marine Co. v. Mulligan, 31 F.2d 532 (2 Cir. 1927); Berwind-White Coal Co. v. Pitney, 187 F.2d 665 (2 Cir. 1951); Morania Barge No. 140, Inc. v. M. & J. Tracy Inc., 312 F.2d 78 (2 Cir. 1962).
 
 
 [1]
 Since the discovery sought has been denied, I do not see how it is possible for the majority to suggest that "(t)he evidentiary material offered in support of (appellants') contentions was . . . of insubstantial value." The majority notes that the evidence offered was an inter-office memo of a Dutch company operating wreck-search vessels and that the memo indicated that its offer of services could not be accepted by TOT without Texaco, Inc.'s authorization. The Dutch vessel, the Orca, was equipped with sonar and other underwater detection devices and located the Texaco Caribbean and Brandenburg wrecks within a half hour after arrival on the scene at the request of the sunken Brandenburg's owner. The pathetic Siren from England's Trinity House anchored near an oil slick about a mile from the wreck of the Texaco Caribbean after vainly searching for it for hours. It is the gist of appellants' complaint that Texaco in New York failed to approve hiring the Orca to locate and mark the wreck of the Texaco Caribbean before the Brandenburg unsuspectingly struck it. Appellants' discovery below was substantially denied by the trial judge's orders confirming a magistrate's recommendations for limited discovery. Appellants were effectively denied the opportunity to depose any of appellee's officers regarding the issue of dominance and control of Texpan by Texaco in New York. Appellants have in my view been placed in a "Catch-22" situation. See Lekkas v. Liberian M/V Caledonia, 443 F.2d 10 (4th Cir. 1971)
 
 
 [2]
 Suppose 20 witnesses had to come to New York from England and 30 from Germany. The total round trip at an average of $750 apiece would be $37,500. The Brandenburg's complaint is for $2,050,000; the Brandenburg Cargo's complaint is for $450,000; the Brandenburg seamen's death claimants' complaints are each for $1,700,000. Moreover, the Supreme Court has noted that international admiralty cases are often dealt with principally by deposition. The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 19, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)
 
 
 [3]
 The whole doctrine might also be reexamined in the light of the dispersion of corporate authority, as here, by the use of multinational subsidiaries to conduct international business
 
 
 [4]
 Appellants deny appellee's assertion that the crews on the British fishing boats witnessed the crash of the Brandenburg. Appellants only agree that the fishing boats aided in rescue hours later
 
 
 [5]
 Indeed, where the parties are not only foreigners, but belong to different nations, and the injury or salvage service takes place on the high seas, there seems to be no good reason why the party injured, or doing the service, should ever be denied justice in our courts. Neither party has any peculiar claim to be judged by the municipal law of his own country, since the case is preeminently one communis juris, and can generally be more impartially and satisfactorily adjudicated by the court of a third nation having jurisdiction of the res or parties, than it could be by the courts of either of the nations to which the litigants belong
 114 U.S. at 368-69, 5 S.Ct. at 866.
 
 
 [6]
 This dissent does not have to go into the problem, but I have very serious doubts whether Judge Metzner's seemingly total reliance on Magistrate Jacobs' report recommending dismissal on forum non conveniens grounds was itself proper under the Federal Magistrates Act, 28 U.S.C. § 636(b) and, e. g., TPO, Inc. v. McMillen, 460 F.2d 348 (7th Cir. 1972). See also Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); CAB v. Carefree Travel, Inc., 513 F.2d 375 (2d Cir. 1975)