**Charles MALKA, Bernard E. Blanchard and Virgil Pacuraru, Plaintiffs,**

v.

**E. F. HUTTON & COMPANY INC., The E. F. Hutton Group Inc., and Joel B. Grae, Defendants.**

**No. 76 Civ. 5592 (MP).**

United States District Court, S. D. New York.

Feb. 14, 1979.

Richard B. Cooper, New York City, for plaintiffs.

Cahill, Gordon & Reindel, New York City, for Hutton defendants, by Thomas F. Curnin, Thomas J. Kavaler, New York City.

## OPINION AND DECISION

POLLACK, District Judge.

This is an action for a brokerage commission alleged to be due the plaintiffs for arranging a loan of money from Saudi Arabian interests to either the Government of France or French national corporations. The plaintiffs are citizens and residents of Canada. The defendants E. F. Hutton Group, Inc., and E. F. Hutton & Company, Inc., are Delaware corporations whose principal place of business is New York. Hutton & Co. is a subsidiary of Hutton Group. The defendant Grae is a citizen and resident of New York.

The Hutton defendants have moved to dismiss the complaint for *forum non conveniens.* For the reasons shown in detail below, their motion will be granted and the complaint dismissed.

### I.

#### *Procedural History*

The complaint was filed in December 1976. The Hutton defendants moved to dismiss the complaint for lack of jurisdiction over the subject matter, failure to join indispensable parties, improper venue, and *forum non conveniens.* After oral argument on March 4, 1977, the Court on March 10, 1977, denied those branches of the motion asserting lack of jurisdiction over the subject matter and improper venue; denied without prejudice to renewal those branches of the motion asserting failure to join indispensable parties and *forum non conveniens*; and stayed all other proceedings pending discovery and an evidentiary hearing on other questions not pertinent here.

The parties appeared again before the Court on June 17, 1977, at which time the

Hutton defendants renewed their motion to dismiss for *forum non conveniens.* On June 21, 1977, the Court filed a memorandum expressing grave misgivings about the propriety and fairness of exercising jurisdiction over this controversy. The Court expressed a desire for briefs on the law applicable to the plaintiffs' claim and, if foreign law was to be applied, on whether the plaintiffs' theory of liability was actionable in France. The Court requested as well a showing that a reasonable basis existed for the claim asserted herein. Pending receipt of these briefs, the Court held in abeyance its decision on the motion to dismiss.

Discovery was then undertaken, including numerous depositions here and abroad. On the basis of the extensive matter so assembled, the parties supplied further briefs setting forth their arguments on the issue of *forum non conveniens.* It appeared without contradiction that the law of France probably would govern the claim and that the theory of liability relied on by the plaintiffs was actionable in the French courts. The Court then took the matter under advisement.

## II.

### *Plaintiffs' Version*

The plaintiffs allege that in 1974 either the Government of France or certain French national corporations ("the borrowers") were seeking loans of up to $4 billion. E. F. Hutton & Company (France). S.A. ("Hutton (France)"), then a second-tier subsidiary of Hutton & Co. but dissolved in 1977, agreed with the borrowers to act as their agent in obtaining the loans. Bernard J. Mallet, President of Hutton (France), turned in Paris for assistance in finding lenders to one Pinay, a Frenchman, who introduced Mallet to another Frenchman, one Lassagne. Mallet met with Lassagne in Paris, and the two agreed orally that Lassagne would help to raise the funds.

Lassagne telephoned from Paris to the plaintiff Malka in Montreal, enlisted his assistance in the search for the loan, and promised him a 2.5% commission. Lassagne confirmed this arrangement by telex to

Malka, sent from Paris with the consent of Hutton (France). Malka brought in his Montreal associates, the plaintiffs Blanchard and Pacuraru. The latter telephoned one Titu-Serban Ionescu, a citizen and resident of New York, and solicited Ionescu's assistance in the search for funds.

Ionescu then took the matter up with the defendant Grae, one of his employers, and Axel Thiel, a West German then living in New York. Grae told Ionescu and Thiel that he knew one Hassan Enany, a well-placed Saudi Arabian who might be able to procure the loans. Ionescu, Grae and Thiel agreed that they would seek Enany's help.

Ionescu then advised Malka and Blanchard in Montreal of the possibility that a loan could be arranged through Enany. Malka relayed the news of this possibility to Lassagne in Paris, who in turn informed Hutton (France).

Lassagne then spoke again by telephone with Malka and Blanchard in Montreal. The three agreed that a loan of $4 billion for 20 years at 6.4% interest should be sought from Enany. The commission to the plaintiffs was to be 2.5%. These terms were to be confirmed by a telex from Hutton (France) to the Bank of the Rhone in Geneva, after which confirmation the borrowers and lenders would be put in touch with each other. Mallet then sent the following telex to the Bank of the Rhone:

attention : mm. pollack, director — blanchard and malka

code e f hutton paris

    paris montreal Lassagne / 7

operation 100 800 1500

1 — conditions of the proposed loan, accepted by the borrowers

— amount 2.500.000.000 us dollars (two billion five hundred million us dollars)

— term   20 years (twenty years)

— interest 6.40% compound fixed (six comma [point] forty percent)

— net proceeds   100% (one hundred percent)

2 — agreement of the borrowers on charges

— engineering financing   2% (two percent)

— commission code malka   2.50% (two comma [point] fifty percent)

— commission code Lassagne   2.50% (two comma [point] fifty percent)

:  3,5)

cent)

— commission

cent)

3 — procedure for disposition

100 millions us dollars shall be released immediately and put at the disposal of lloyds zurich—telex 56635—attention of mr muller, director—under the code reference above.

the disposition of the balance of the loan shall be made according to a method of operation determined by the parties conforming with negotiations which have to start immediately.

copy of the instant telex was sent to lloyds zurich which is waiting for confirmation from you of the commitment for the first block of 100 million dollars (hundred million)

bernard mallet, president general director of e f hutton (france) s a

vru

please ignore the three lines ":3,5) cent)—commission" transmitted by mistake

*correctly* received   *   *   *

The plaintiffs claim that by this telex Hutton (France) became liable to them for a commission of 2.5% of the loan.  The Bank of the Rhone confirmed to the plaintiffs that it had received Mallet's telex.

Ionescu and Grae, in New York, then telphoned Enany in New Delhi.  Enany said that he could arrange loans of $3 billion or more if the loans would be sufficiently guaranteed.

Ionescu and Grae then telephoned Blanchard in Montreal.  Blanchard and Grae agreed that Blanchard would send Thiel a telex requesting loans of $3.9 billion, which telex Thiel would present to Enany in Beirut.

Thiel then left New York for Beirut via Bremen.  At Ionescu's suggestion, Grae called Thiel in Bremen and told him to meet in Paris with Mallet, who would give him a written confirmation of the loan request to take to Enany.

Grae, Thiel, Enany and Mallet then conspired by telephone to by-pass the plaintiffs in arranging the loans and thereby to deprive them of their commission.  Mallet and Thiel called Enany to confirm these plans to defraud the plaintiffs.

Mallet then gave Thiel two letters, both on the letterhead of Hutton (France).  One was addressed to the Minister of Finance of Saudi Arabia, the other to Enany.  The letter to the Minister stated:

PARIS, June 24th. 1974.

To his Excellency the Minister of Finance of the Kingdom of SAUDI ARABIA

Your Excellency,

I, Bernard MALLET, Chairman of E.F. HUTTON (France) S.A. which is part of the E.F. HUTTON Group, one of the leading American Investment Banks, has been requested to secure and prenegotiate for prime French National Companies of the highest standing, a first loan of US $100.000.000 at the following conditions :

| | |
|---|---|
| — amount | : US $ 100.000.000 – – |
| — period | : 20 years |
| — Interest | : 6.40% (compounded annualy and fixe) |
| — emission | : 100%. |
| — guarantee | : one or two prime national or international banks |
| — payback | : capital and compounded interest repaid at the end of the 20 year period, in one payment. |

I wish to confirm that the negotiation of this deal it to be carried out in an utmost secrecy and I will also state that there is a firm and direct offer from the Borrower' side.  I would like to add that we have been seeking for this capital several weeks and have not been able to contact the proper lending source.

I will be at your disposal and will, if necessary, come directly to a place designated by you or your people, to have prenegociation in behalf of this matter.

Yours sincerely,

Bernard J. MALLET
Chairman.

The letter to Enany stated:

PARIS, June 24. 1974.

His Excellency HASSAN ENANI

Your Excellency,

Following our conversations on the phone and the meeting held in Paris on Sunday June 23. with Mr. Axel THIEL, we are sending enclosed the official confirmation that we are seeking for French National Companies of the highest standing, long term funds on a 20 year period and at a compound rate, the pay back being paied at the end of the period. It is understood that the loan will be guaranteed by first class National and/or International Banks. ·

Please find enclosed for your guidance the 1973 annual report of our group and an example of the "YEAR COUNTDOWN AND COUNTOUT".

I remain, Your Excellency,

Yours sincerely,

Bernard J. MALLET
Chairman.

Thiel delivered these letters to Enany in Beirut. Enany then flew to Saudi Arabia, where he presumably arranged the loan. The loan, of $4 billion, closed during the second week of July 1974. Commissions of $289 million were allegedly paid, of which the plaintiffs received nothing.

The plaintiffs now sue for $80 million, or 2.5% of the loan minus $20,000,000 that they apparently promised Ionescu for his help. The plaintiffs have not sued Hutton (France). Rather, they have sued Hutton Group and Hutton & Co. on the theory that they are vicariously liable for the obligations of their subsidiary Hutton (France), which in turn is alleged to be liable because it was the agent of an undisclosed principal and therefore is liable to its sub-agents for the commissions that it promised them on behalf of its principal. The plaintiffs' claim against Grae presumably is one of interference with contractual relations.

## III.

### Defendants' Version

Although the merits of the plaintiffs' claims are not now being considered, it is relevant to the question of *forum non conveniens* to look at the moving defendants' version of the facts in order to appraise the justice of a trial in this forum.

Bernard J. Mallet testified in his deposition that in May 1974 he was approached in Paris by a M. Andre Branche, a French citizen and chairman of Sternmark, a French company. M. Branche was acting as a representative of several French national companies, which wanted to borrow from $100 million up to $1 to 2 billion. Because the borrowers were French national corporations, the loans would automatically bear the guarantee of the Government of France. M. Branche sought Mallet's help in finding lenders.

Mallet testified that, in his search for lenders, he was introduced to Lassagne by a friend, one Blum, who in turn knew Lassagne through Pinay. Mallet testified that he had the following conversation with Lassagne:

He said he could probably provide the necessary funds to satisfy the demands of the French nationalised companies and we discussed the problem and the ways to do it, and I said "O.K. Give me the proof that you have got the funds by making evidence of the funds wherever you want and then we will sit together with the borrowers and then set up the operation. But I am not going to do anything"—I say anything—"before you give me the evidence of the funds in any bank you want as long as it is one of the top international leading banks.".

In support of their contention that no loan ever closed, the Hutton defendants point to an exchange of correspondence between the plaintiffs and the French President and Minister of Finance, in which the plaintiffs were advised that no loan ever closed. On August 29, 1974, Blanchard wrote to the President of France that:

> We are the attorneys for a Canadian Group whose members, known under the Code "Malka", have concluded a loan in the amount of three billion American dollars from the Kingdom of Saudi Arabia to France.
>
> .    .    .    .    .
>
> [T]he Malka group put the Company, E. F. Hutton in direct contact with the representative of King Faisal, His Excellency Hassan Enani. By letter of June 24, 1974 addressed to Mr. Enani and the Saudi-Arabian Minister of Finance, Mr. Bernard Mallet sent the official confirmation that he was seeking long term loans for some French National Companies and guaranteed by national or international banks.
>
> The loan in the amount of three billion American dollars was consummated early July 1974, but the commission agreed upon was not paid on the pretext that the said loan was concluded directly between the Minister of Finance of Saudi Arabia and the Bank of France, without any intervention or participation on the part of E.F. Hutton (France) S.A., or of its president. Mr. Bernard Mallet.
>
> We have the firm belief of the contrary, to wit, that the Canadian Group had been the instrument by which the loan had been concluded at the request and by the intervention of Mr. Bernard Mallet, even if in the signing of the loan these persons had not been involved.

The letter requested an investigation to safeguard the honor and reputation of all those who had acted in the matter.

In response to Blanchard's letter the President of France stated in a letter of September 9, 1974, that he had referred their inquiry to the Minister of Economy and Finance. That Minister replied by the following letter of November 8, 1974:

> You have informed the President of the French Republic that you are the attorneys for a Canadian group whose members, known under the code name "Malka" allegedly obtained for the benefit of France a loan of three billion U.S. dollars from Saudi Arabia, and was apparently having trouble obtaining payment of commissions which had been promised to them in this matter by Mr. Mallet, President-General Director of E.F. Hutton, France. You have asked him to intervene on your behalf. I must advise you that I am totally unaware of the transaction which you report, since neither the French government nor the Bank of France has contracted to borrow three billion dollars from Saudi Arabia.

Mallet testified that when he received a copy of Blanchard's letter it was the first time he had heard that any loan had closed. He went to the Bank of France, which clears all international financing, public or private, and asked what happened. He was told there that no loan had closed. Mallet related this information to Lassagne, who did not believe it. So Mallet took Lassagne to the Bank of France and spoke to the head of the Foreign Department, M. Raymond. The latter told Mallet and Lassagne that he had never heard of such a loan, never heard of Hutton (France) in any way at all connected with such a proposed loan, never heard of the involvement of any bank or governmental department in such a loan, and said indeed that the Bank would have no need of Hutton (France) for this sort of thing because the Bank had other means of raising such funds as these. In short, they were told that no such loan ever closed.

In addition, Mallet testified that because loans to nationalized companies bear the Government's guarantee, notice of them is published in the official newspaper, the *Journal Officiel de la Republique Francaise.* No notice of such a loan was ever published.

## IV.

### Applicable Law

■ In applying the doctrine of *forum non conveniens*,[1] the Courts consider any factor that bears on the interest of the original and alternative forums in the subject matter of the suit or on the possibility in either forum of a fair, expeditious and inexpensive trial. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. . . .

Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

(*Gulf Oil, supra*, 330 U.S. at 508–09, 67 S.Ct. at 842; *see also Schertenleib, supra*, 589 F.2d at 1164–65.)

When the balance of these factors is strongly in favor of trial elsewhere, the complaint must be dismissed. *Gulf Oil, supra*, 330 U.S. at 508, 67 S.Ct. 839; *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 450 (2d Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1972).

■ Applying these factors in the present case, the Court finds not only that the balance of convenience is strongly in favor of trial in France, but also that retaining jurisdiction here would be materially unjust to the defendants.

The only events that took place in New York, other than communications between the plaintiffs and their associate Ionescu, were the initial meeting between Ionescu, Grae and Thiel; Grae's telephone call to Enany in New Delhi, in which Grae asked Enany about the possibility of a loan; Grae's call to Thiel in Bremen, in which Grae conveyed Ionescu's suggestion that Thiel meet Mallet in Paris; and Grae's call to or from Thiel, Enany and Mallet, in which they allegedly conspired to by-pass the plaintiffs and Ionescu. Of these events the most significant is the last. Yet France has at least as great a connection as New York with the alleged conspiratorial telephone call, since Mallet was in Paris and Thiel in either Paris or Bremen. And Mallet and Thiel, both by then in Paris, confirmed the alleged plan in a second call to Enany.

Because all of the important events in this case took place in France, the witnesses to those events are also in France. One important question is whether Hutton (France) entered into the alleged agency agreement with Lassagne; another is whether Hutton (France) authorized the

---

1. It is unsettled whether the state or federal law of *forum non conveniens* is to be applied in a diversity case. As the Second Circuit has recognized, however, the New York law of *forum non conveniens* under CPLR R 327 is so similar to the federal law that it is unnecessary to decide which should apply. *See Schertenleib v. Traum*, 589 F.2d 1156, 1162 n. 13 (2d Cir. 1978); *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1972).

plaintiff to seek the loan through Enany. On these questions the only witnesses with personal knowledge are Mallet and Lassagne, both citizens and residents of France and beyond the process of this Court. The next best witness would be Malka, who, as a plaintiff, would testify in either France or New York and for whom a trial in France would be scarcely less convenient than a trial here.

The central question, as already indicated, is whether any loan ever closed. On this question virtually all reliable evidence is in France. The plaintiffs have had for some time the letter from the Government of France and the information from the Bank of France, through which all foreign loans are cleared, stating that no such loan had ever been made. The plaintiffs now intimate that the Government of France lied when it stated that no loan was closed. Under the act-of-state doctrine, it is highly doubtful that the French Government can be questioned in the courts of this country. *See, e. g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 723, 11 L.Ed.2d 804 (1964). Similarly, the alleged lenders and borrowers, other sources of reliable evidence on the closing of any loan, are in France or Saudi Arabia, beyond the process of this Court.

The poor quality of the evidence that the plaintiffs now say, after extensive discovery, that they could offer at trial in New York is proof of the injustice of retaining jurisdiction here. The plaintiffs adduce six items of available evidence. Ionescu, Grae and a Mrs. de Rosset, an associate of Grae, will testify that they heard Mallet admit on the telephone that the loan closed. The probative force (indeed, the admissibility) of Mallet's admissions, however, is thrown into doubt by the plaintiffs' fourth piece of evidence, a tape recording of a conversation in

which Mallet is said to have stated that the loan closed. In this conversation, Mallet asserts that he has no first-hand knowledge, but that a "Mr. Gikel [a French civil servant] confirmed it [the closing of the loan] to me." Gikel then says that he has no personal knowledge, either: "Ah, yes, I received some information: the deal is finished." Mallet is unsure even of whether the loan that Gikel told him of is the same one that Hutton (France) had sought: "I'm not absolutely sure the deal is not quite separate from ours." Lassagne then says that the deals are the same, but he does not say how he knows. The last item of evidence that the plaintiff could offer is a tape-recording of a conversation in which Lassagne states that the loan closed. But the source of his knowledge is unstated.[2]

## V.

### Material Injustice Involved

If ever there was a case to be tried in France in the interest of justice, this is it. France has the greatest nexus with the events involved; French law will probably govern the claim; the Government of France, its national companies and the Bank of France all are available only in France; and nearly all material witnesses and records indispensable to a just resolution are located in France. For all these reasons, the Court finds that the balance of convenience is strongly in favor of trial in France and that retaining jurisdiction here would pose a danger of material injustice to the defendants.

Accordingly, the complaint is dismissed on the conditions that (1) the courts of France have jurisdiction to adjudicate the claims asserted herein; (2) the defendants appear generally in any action asserting the present claims filed against them in France by Malka, Blanchard or Pacuraru; and (3)

---

2. Curiously, the plaintiffs have not sued Hutton (France), the party primarily liable even under their theory of vicarious liability. A clue to this omission may be found in the simultaneous filing through the same attorney of the suit docketed as 76 Civ. 5591. In that case the plaintiff is Ionescu, the New York associate of the plaintiffs, and the defendants are Hutton (France), Mallet and Thiel. Presumably, Ionescu did not sue Hutton Group, Hutton & Co. or Grae because the Court would have had no diversity jurisdiction, and the Canadian plaintiffs here did not sue the defendants in 76 Civ. 5591 because the Court would not have had jurisdiction of such a suit between aliens.

in any action asserting the present claims filed against them in France by Malka, Blanchard or Pacuraru, the defendants waive any defenses, including the statute of limitations, that they did not have at the time this complaint was filed.

SO ORDERED.