Abolbashar **FARMANFARMAIAN,**
Plaintiff,

v.

**GULF OIL CORPORATION** et
al., **Defendants.**

No. 75 Civ. 5945.

United States District Court,
S. D. New York.

Sept. 8, 1977.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Martin Kleinbard, Robert S. Smith, Adele R. Wailand, New York City, for plaintiff.

Sullivan & Cromwell, New York City by Robert MacCrate, James R. DeVita, New York City, Benjamin T. Richards, Jr., Exxon Corp., New York City, for defendant Exxon Corp.

Hughes, Hubbard & Reed, New York City by Otis Pratt Pearsall, John A. Donovan, Ronald J. Tabak, New York City, for defendants American Independent Oil Co., Atlantic Richfield Co., Charter Oil Co., Continental Oil Co., Getty Oil Co., The Standard Oil Co., an Ohio corp.

Lord, Day & Lord, New York City by John W. Castles, 3d, Eugene F. Bannigan, New York City, Pillsbury, Madison & Sutro, San Francisco, Cal. by Turner H. McBaine, Thomas E. Haven, San Francisco, Cal., for defendant Standard Oil Co. of California.

John E. Bailey, Gulf Oil Co.–U.S., Houston, Tex., M. C. Pfautz, Gulf Oil Co.–U.S., Phila., Pa., for Gulf Oil Corp.

Donovan, Leisure, Newton & Irvine, New York City by A. Vernon Carnahan, John P. Casaly, New York City, H. Francis Shattuck, Jr., David H. Finnie, Mobil Oil Corp., New York City, for Mobil Oil Corp.

Charles F. Kazlauskas, Jr., Lawrence R. Jerz, Texaco, Inc., New York City, for defendant Texaco, Inc.

## OPINION

ROBERT L. CARTER, District Judge.

### Facts

The plaintiff, Dr. Abolbashar Farman-farmaian, is an Iranian citizen and resident. He is also a shareholder in the Pazargard Chemical Company ("Pazargard"), an Iranian petrochemical manufacturer, and a company which he founded.[1] Plaintiff and members of his family or associates were apparently the sole shareholders in Pazargard until 1965, when the capital structure of Pazargard was reorganized to obtain additional financing. Under the reorganization, plaintiff and his associates relinquished majority control of the company, and four classes of stock (A, B, C, D) were set up: plaintiff's group retained 6,000 shares of class A and 9,000 shares of class B stock; 15,000 shares of class C stock were issued to the National Petro-Chemical Company of Iran ("NPC"), a subsidiary of the National Iranian Oil Company ("NIOC");[2] and 15,000 shares of class D stock were issued to the Iraanse Aardolie Raffinage Maatschappij (Iranian Oil Refining Company) N.V. ("IORC").[3] NPC and IORC each

---

**1.** The chemicals produced by Pazargard, principally chlorine and caustic soda, are apparently of considerable importance in the oil refining process. According to the unrebutted assertion of plaintiff, Pazargard is the sole Iranian manufacturer of these chemicals. Farman-farmaian aff., p. 3, ¶ 6.

**2.** NIOC is an Iranian corporation, and is wholly owned and operated by the Iranian government. NIOC is the entity through which Iran carries out its national oil policies. Defs.' joint 9(g) statement, ¶ 5.

**3.** IORC is organized under the laws of the Netherlands. Its principal place of business is in Iran, and it is registered to do business in Iran. Defs.' joint 9(g) statement, ¶ 7. All of the outstanding stock of IORC is owned by Iranian Oil Participants Limited ("IOP"), a corporation organized under the laws of England. Approximately 40 percent of its stock is held by the defendants in this action. The other 60 percent of the stock is held by three foreign oil companies. Id. at ¶¶ 9–10.

Defendants have asserted in their 9(g) statement that neither IORC nor IOP has any offices, agents or employees in the Southern District of New York or elsewhere in the United States. Id. at ¶¶ 8, 11 respectively. Plaintiff denies this assertion. Pl's. 9(g) statement, ¶ 15. Defendants contend that because plaintiff has offered nothing to support this denial, the denial is inadequate under Rule 56(e), Fed.R.Civ.P., to raise an issue of fact for summary judgment purposes. Defs.' reply memorandum, p. 26, n.*. Plaintiff argues that at this point he is obligated to do no more than he has since he has not yet had an opportunity for full discovery. Pl's. 9(g) statement, ¶ 15. However, though the plaintiff has now had nine months of discovery on the issue of *forum non conveniens*, he has uncovered nothing to support his denial of defendants' assertions. It must be assumed, therefore, that IORC and IOP do not have any offices, agents or employees in the Southern District of New York or anywhere in the United States.

paid 50 million rials (approximately $750,-000 valued at the current exchange rate) for the stock.

Plaintiff alleges that at the time the Pazargard shares were issued he was orally promised by IORC that he would be given a chance at a later date to repurchase the class D shares at cost. IORC was to afford plaintiff this opportunity at such time that Pazargard had managed to balance its prior losses. Farmanfarmaian aff., ¶ 9. It is alleged further by plaintiff that this oral agreement was reduced to writing in 1971. The written agreement, however, was not simply a grant to plaintiff from IORC of the right to purchase the class D shares. Instead, the Iranian Investment Corporation ("IIC")[4] contracted with IORC for an option to acquire 15,000 class D shares. By this same agreement, plaintiff contracted with IIC for an option to purchase the 15,000 class D shares at 3,334 rials per share. See Cplt., Appendix A.

According to the plaintiff, in February, 1972 he properly exercised his IIC option, and both IIC and IORC were fully prepared to follow through with their contractual obligations. Farmanfarmaian aff., ¶ 12. Plaintiff alleges, however, that because of the actions of defendants and their alleged co-conspirators, IORC and IIC breached their contractual obligations and transferred the class D shares to NIOC instead of to the plaintiff.[5]

The story of this alleged contractual interference contains all the ingredients of a fascinating novel. According to plaintiff, defendants' "co-conspirator" NIOC, an agent of the Iranian government, strongly opposed the sale of the class D shares to Farmanfarmaian, because of the fear that such a sale would threaten NIOC's control of Pazargard. Since Pazargard manufactures chemicals used in the oil refining process, NIOC was interested in seeing that control of the company rested in it—i.e., the government—and in preventing Farmanfarmaian from reacquiring control. See Farmanfarmaian aff., ¶ 14, Pl's. brief, filed April 19, 1976, p. 9 et seq.

Furthermore, contends plaintiff, defendants were made aware of NIOC's feelings and had substantial motive to ingratiate NIOC by blocking the IIC/IORC transfer of Pazargard shares to plaintiff. This motive was simply that at the time these shares were about to be transferred, defendants and the three other non-American members who made up the Oil Consortium of Iran (the "Consortium") were renegotiating the 1954 Oil Agreement, which gave the Consortium the right to produce, refine and market Iranian oil. Under the renegotiated agreement reached in July of 1973, the Consortium members retained the right to market Iranian oil but relinquished the right to produce and refine the oil, the latter right becoming the exclusive province of the Iranian government. In essence plaintiff charges that the importance of these renegotiations was of sufficient magnitude that the defendants were induced to cause IIC and IORC, wholly owned by them along with the three non-American companies, to breach their contractual obligations to plaintiff. As plaintiff interprets what occurred, the defendants acted in the belief that "cooperation" with NIOC in the area of the Pazargard shares would result in a renegotiated agreement more favorable to them than they would be able to achieve without such cooperation.

Plaintiff states that since he viewed both IORC and IIC as "instrumentalities of the Consortium [i.e., the 11 defendant oil companies and the three non-American oil companies who own both companies]," he understood that the contractual arrangement was merely for the convenience of the Consortium.

**4.** IIC is a private company organized under the law of Iran. Its stock is wholly owned by the eleven defendants (40%) and the three non-American oil companies (60%) who also own a majority of the IOP stock. Defs.' joint 9(g) statement, ¶ 28. IIC has its principal place of business in Iran. It has no offices, agents or employees in the Southern District of New York, or elsewhere in the United States. Id. at ¶ 29. (This last assertion is again challenged by plaintiff at ¶ 15 of his 9(g) statement, but see discussion in the second paragraph of note 3.)

**5.** NIOC is not a party to this litigation, and plaintiff does not here seek the return of these shares.

The method by which the defendants allegedly conspired with IIC, IORC and NIOC was to give NIOC veto power over the transfer of the class D Pazargard shares. This power was conferred [6] on NIOC by the "Transfer Agreement," Pl's. exh. 9, an agreement signed on the same day as the Renegotiated Oil Agreement. The Transfer Agreement was signed not by the defendants but by their trading company subsidiaries, along with NIOC, IORC and several other parties. Clause 8 of this agreement reads:

"Arrangements for the disposal of the shares in Pazargard Chemical Company will be subject to agreement between NIOC and IORC."

In December of 1973, the 15,000 class D shares were transferred to NIOC. Plaintiff was advised of this by letter from one Roger Varian, a liquidator of IORC,[7] who plaintiff claims also represented the interests of the Consortium members in the whole series of actions leading to NIOC's purchase of the Pazargard class D shares.

## Claims

Based on the above allegations, plaintiff has asserted three claims for relief: first, a claim for conspiracy and tortious interference with his contractual rights, grounded on the assertion that the defendant oil companies induced IORC to breach its contract with plaintiff; second, a claim for breach of contract on IIC's part, based on the theory that defendants were the *alter ego* of IIC with respect to IIC's alleged breach, and that the court may pierce the corporate veil

which defendants contend insulates them from suit in this matter; and third, a claim for recovery as a third-party beneficiary of the IORC–IIC option agreement which IORC allegedly breached.

Defendants have moved pursuant to Rules 12(b) and 44.1, Fed.R.Civ.P., to dismiss the complaint or in the alternative for summary judgment on three grounds: first, that this court is *forum non conveniens*; second, that plaintiff has failed to state a claim upon which relief can be granted—under either Iranian or New York law; and third, that the act of state doctrine precludes any finding of liability on their part. Both sides have submitted 9(g) statements pursuant to our local rules, as well as numerous affidavits, briefs and letters in support of their contentions. Since I agree with defendants that this is a *forum non conveniens*, no other issue need be reached.

## Discussion

In the context of this case, the issue of *forum non conveniens* has an unusual twist. Defendants are all American oil companies with their headquarters in New York City or elsewhere in the United States, yet they contend that this court is *forum non conveniens*, and that plaintiff's claims should be adjudicated in Iran. Conversely, plaintiff, an Iranian citizen and resident, desires to bring his claims here, and wishes no part of his home forum.[8] Indeed, it should be noted that while plaintiff charges that his rights were interfered with by the conspiracy of the American defendants, and three

**6.** Defendants argue that NIOC may have possessed such a veto well before the Transfer Agreement was even contemplated. Defendants assert that the 1965 investments by IORC and NPC (an NIOC subsidiary) were made pursuant to a Memorandum of Intent that NIOC and NPC *interpret* as requiring their consent before the IORC shares could be transferred. *See* Defs.' Joint Reply to Pl's. Supplementary Brief, at p. 22 *et seq.* Plaintiff, as one might imagine, adamantly disagrees with this contention.

**7.** IORC began the liquidation process, apparently, after the right to refine Iranian oil was taken from the non-Iranian oil companies and transferred to the Iranian government by the

New Oil Agreement. When on December 10, 1974, plaintiff served a notice of claim on the IORC liquidators, the statute of limitations on any claim plaintiff might have against IORC was tolled, and the IORC liquidation was prevented from being completed. Nateghi aff., ¶ ¶ 9, 13–15. A similar notice of claim was served by plaintiff on IIC on December 15, 1974.

**8.** Plaintiff states, in fact, that suit in the Iranian courts "would be of little praetical [sic] use to me; I do not believe that [such a suit] . . . is a viable alternative." Farmanfarmaian aff., ¶ 23.

Iranian oil companies, IORC, IIC and NIOC, only the Americans have been named in this suit. Plaintiff has conceded that this choice of defendants was made to preserve the diversity jurisdiction of this court.[9]

The threshold question that must be confronted is whether on the facts of this case the doctrine of *forum non conveniens* is an appropriate consideration. Defendants assert their consent to jurisdiction of Iranian courts if sued there, but since defendants are not registered to do business in Iran, they are not subject to suit there if plaintiff's interpretation of Iranian law is correct. Farmanfarmaian aff., ¶ 22; Omidvari aff. (July 5, 1976). *But see* affidavits of Messrs. Sabi and Nateghi, defendants' experts, which contend that Iran would have had jurisdiction over defendants at the time the instant suit was commenced. Plaintiff's recital of Iranian jurisdictional law—assuming its correctness at this point—raises a curiously difficult issue: whether the consent of American defendants to a foreign jurisdiction creates an alternate forum such that, if appropriate, the court may decline jurisdiction over the claims of a foreign plaintiff and leave that plaintiff to the remedies of the consented to forum. It is plaintiff's contention that the proper answer to this question is "no." Defendants, of course, hold a contrary view.

The beginning point of investigation into this question is the Supreme Court's decision in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1946). In *Gulf Oil*, which involved Americans as both plaintiff and defendant, the Court by Justice Jackson, said:

> "In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes the criteria for choice between them." 330 U.S. at 506–07, 67 S.Ct. at 842.

Since *Gulf Oil*, the condition of an available alternate forum to the dismissal of an action on the ground of inconvenience has been steadfastly adhered to by our courts. *See, e. g., Tivoli Realty v. Interstate Circuit*, 167 F.2d 155 (5th Cir.), *cert. denied*, 334 U.S. 837, 68 S.Ct. 1494, 92 L.Ed. 1762 (1948); *Esso Transport Co. v. Terminales Maracaibo, C.A.*, 352 F.Supp. 1030 (S.D.N.Y.1972); *Domingo v. States Marine Lines*, 340 F.Supp. 811 (S.D.N.Y.1972); *Fiorenza v. United States Steel International, Ltd.*, 311 F.Supp. 117 (S.D.N.Y.1969); Restatement of the Law (Second), Conflict of Laws § 84(c)(2).

This rule is clearly grounded on due process considerations. If dismissal of an action on *forum non conveniens* grounds were not conditioned on the availability of another forum, the plaintiff might find himself with a valid claim but nowhere to assert it. *See Esso Transport Co. v. Terminales Maracaibo, C.A., supra*; *Tivoli Realty v. Interstate Circuit, supra*. However, where as here the defendants have consented to submit to jurisdiction in the proposed alternate forum, that problem would seem to disappear. Indeed, even without the consent of the defendants to the other forum, it is possible to condition the dismissal of a complaint on such a submission and thus not leave the plaintiff remediless. *See Grammenos v. Lemos*, 457 F.2d 1067, 1074, n.5 (2d Cir. 1972).

Yet in most of the cases where dismissal was conditioned on submission to the jurisdiction of another forum, the courts never had to reach the contention asserted here: namely, that dismissal on *forum non conveniens* grounds is unwarranted unless the same claims could have been brought originally against the same defendants in the alternate forum, even without their consent.[10] The plaintiffs in those cases appar-

---

**9.** Although defendants have challenged the appropriateness of this forum, they do not assert that this court lacks jurisdiction to redress the wrong, if any, they may have caused plaintiff.

**10.** At one point the defendants contended that the fact that they were not amenable to service

in Iran was of no import, because plaintiff's "real" grievance is against IIC, IORC, NIOC and the Iranian government, who were unquestionably amenable to service in Iran at all times. This contention is clearly without merit. Plaintiff has asserted a claim against these defendants, and if his claim is valid, he cannot be

ently objected solely on the ground that the original jurisdiction was the more appropriate.

There are a number of instances, however, in which the issue was directly faced; and while some judges have expressed divergent views, notably Judge Weinfeld in *Noto v. Cia Secula di Armamento*, 310 F.Supp. 639 (S.D.N.Y.1970), the majority of cases have held that amenability of process *ab initio* in the proposed alternate forum is a necessary condition to the application of the *non conveniens* doctrine.

■ Nevertheless, it appears to me with all respect that the majority rule finds its basis more in history and tradition than in careful analysis, at least insofar as it applies to the common law doctrine of *forum non conveniens* and not to the statutory codification of that doctrine in transfer cases, 28 U.S.C. § 1404(a), and should now be abandoned. It is *Gulf Oil* to which we must look first to support this assertion.

In *Gulf Oil* an action had been brought in the Southern District of New York by a Virginia plaintiff, who charged a Pennsylvania defendant with negligently causing plaintiff's Lynchburg, Virginia warehouse to catch fire. The defendant, who was qualified to do business in both New York and Virginia—and amenable to service in either locale—moved to dismiss the plaintiff's complaint and to remit plaintiff to the Virginia courts. That motion, granted by this court, was reversed on appeal. On *certiorari*, the Supreme Court reinstated the district court's holding. In doing so, the Supreme Court rejected the circuit court's restrictive view of the applicability of the *non conveniens* doctrine in a federal forum, and explained its previous restrictions on the applicability of that doctrine to cases brought under the Federal Employers' Liability Act (FELA), 45 U.S.C.A. § 51, *et seq.*, *see, e. g., Baltimore & Ohio R. C. v. Kepner*, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed.28 (1941),

which the Court of Appeals had interpreted as a "warn[ing] against refusal of jurisdiction in a particular case controlled by congressional act." *Gilbert v. Gulf Oil Corporation*, 153 F.2d 883, 885 (2d Cir. 1946). The Court of Appeals had read *Kepner* along with *Neirbo Co. v. Bethlehem Shipbuilding Corp., Ltd.*, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167 (1939)—in which the Court had interpreted the general venue statute dealing with diversity suits as giving the defendant "a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election," 308 U.S. at 168, 60 S.Ct. at 155—as requiring the district court to retain jurisdiction over the plaintiff's claim. However, the Supreme Court in *Gulf Oil* found *Kepner* and *Neirbo* unsupportive of the circuit court's decision.

The Court explained that the FELA, which controlled in *Kepner*, specifically provides where venue may be had on a suit arising under it, and that the *Neirbo* decision meant simply that if the defendant files consent to be sued, it waives its right to be sued at its place of residence and may be sued in the jurisdiction where it has consented.

"[*Kepner* and *Neirbo*] taken together mean only that the defendant may consent to be sued, and it is proper for the federal court to take jurisdiction, not that the plaintiff's choice cannot be questioned. The defendant's consent to be sued extends only to give the court jurisdiction of the person; it assumes that the court, having the parties before it, will apply all the applicable laws, including in those cases where it is appropriate, its discretionary judgment as to whether the suit should be entertained. In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine fur-

deprived of the jurisdiction of this court simply because he may also have a valid claim against certain other parties. It is, of course, the plaintiff's prerogative to sue whomever he wishes, and it is irrelevant to the *forum non conveniens* determination whether or not he has chosen

wisely. On the other hand, if the plaintiff's "real" claim is solely against these other parties, then his complaint against the American defendants will fail, but for failure to state a cognizable claim and not for inconvenience of forum.

nishes criteria for choice between them." 330 U.S. at 506–07, 67 S.Ct. at 842.

■ Plaintiff sees this language as strong support for its position. I disagree. There was never any question in *Gulf Oil* that the defendant was amenable to process in either New York or Virginia, since it had designated officials of both states to receive service on its behalf. While read literally *Gulf Oil* states that for the purposes of *forum non conveniens* an alternative forum is one in which the defendant is subject to process, however, this was merely *dicta*, and may or may not have been a conscious circumscription of the doctrine. At any rate, it is my belief that in all probability the Court in *Gulf Oil* meant to do nothing more than condition the use of *forum non conveniens* on the existence of two forums, without anticipating that the lower courts would read into its opinion a requirement that jurisdiction in the alternative forum exist *ab initio*.[11]

Nevertheless, as will be seen, this seemingly innocuous reference to service of process in *Gulf Oil* has had a significant impact on the development of the law of *forum non conveniens*. In *Tivoli Realty, Inc. v. Interstate Circuit, Inc.*, 167 F.2d 155 (5th Cir.), *cert. denied*, 334 U.S. 837, 68 S.Ct. 1494, 92 L.Ed. 1762 (1948), the plaintiff (Tivoli), a Texas corporation, brought suit in Delaware alleging that the fourteen defendants, four New York corporations and the rest Delaware companies, had collusively assigned plaintiff's Dallas theatre an inferior playing position and had denied it the opportunity to compete for feature movies. Before answering the complaint two of the defendants filed suit in Texas District Court, seeking to enjoin the Delaware action. Seven of the other defendants intervened and joined in the prayer for injunc-

tive relief. The five remaining defendants did not intervene but filed papers offering to submit to the venue of the Texas court, if the Delaware action were brought in Texas. These five defendants, however, denied that the Texas court had jurisdiction over them. After a hearing, the district court granted the injunction on grounds of *forum non conveniens.*

The Court of Appeals reversed, stating: "The doctrine of forum non conveniens furnishes the criteria for choice between two or more forums in which the defendant is amenable to process. At least two such forums must be open to the defendants before the doctrine comes into play; and they shall not be dependent merely upon the will or grace of the defendant, but must be provided by law." 167 F.2d at 156–57.

As support for this proposition, the Fifth Circuit cited the portion of *Gulf Oil* just discussed. Exactly what the court in *Tivoli* meant by this, however, is again not entirely clear. In elaborating on its holding, the court noted that the five parties who failed to intervene in the Texas suit were allegedly the principal conspirators in the Delaware action, and that as a consequence of the injunction Tivoli could not require these five defendants to plead in the Delaware action, nor could it proceed against them in any way. The court stated further that "[t]he failure of these five to intervene, and their written statements that they were not subject to the venue of the court below, evidence that this case is not one in which the doctrine of forum non conveniens applies, because, as stated to be necessary by Mr. Justice Jackson, there are not two forums in which the entire group of defendants is answerable to process." 167 F.2d at 157.

---

11. In this light, it is interesting to note that the common law of *forum non conveniens* appears to have developed in England with little regard to whether an alternative forum existed that had jurisdiction. In America the only early articulation of the doctrine seems to have been to place the burden on the plaintiff to show that if the original forum declines jurisdiction he will be remediless, or that a failure of justice would occur. Blair, *The Doctrine of Forum*

*Non Conveniens,* 29 Colum.L.Rev. 1, 33 (1929). It would seem that under this rationale, the defendant's consent to the institution of the action in another forum would, absent prejudice to the plaintiff of a significant nature (*e. g.,* the action has been barred by operation of a statute of limitations) be a sufficient predicate for the original forum to decline jurisdiction on *non conveniens* grounds.

It may be inferred from this that had these five defendants intervened in the Texas action, the doctrine of *forum non conveniens* could be applied, because had that occurred the venue of the Texas court over the defendants (using the circuit court's own words) would have been "provided by law," *see Neirbo v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167 (1939), and not by "the grace of the defendant." Whether the circuit court anticipated this reading, or not, it seems doubtful that by this opinion it meant to foreclose entirely the application of the *forum non conveniens* doctrine even if dismissal would not leave the plaintiff remediless and would in fact be in the interests of justice.

Whatever uncertainty there may have been as to the effect of consent in *forum non conveniens* questions after *Tivoli*, there remained little ambiguity after the Supreme Court decided *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), at least as far as 28 U.S.C. § 1404(a) was concerned. Section 1404(a) provides:

"Change of venue.

"(a) For the convenience of parties and witnesses in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

In *Hoffman*, the Supreme Court was faced with the question of whether a district court, before which a civil suit has been properly brought, has the power under § 1404(a) to transfer the case to another district where, absent the defendant's consent, the suit could not have been brought originally. The petitioners argued that under § 1404(a), the phrase "where it might have been brought" should relate not only to the time when the action was brought, but also to the time of the transfer. In other words, the petitioners contended that consent to the other forum would allow transfer under § 1404(a). The Court disagreed, but an analysis of its opinion shows that its answer was narrowly grounded on a *statutory* construction of § 1404(a). Justice Whittaker wrote:

"This Court has said, in a different context, that § 1404(a) is 'unambiguous, direct [and] clear,' *Ex parte Collet*, 337 U.S. at page 58, 69 S.Ct. at page 946, and that 'the unequivocal words of § 1404(a) and the legislative history * * [establish] that Congress indeed meant what it said.' *United States v. National City Lines, Inc.*, 337 U.S. 78, 84, 69 S.Ct. 944, 958, 93 L.Ed. 1226. Like the Seventh Circuit, 260 F.2d at page 322, we think the dissenting opinion of Judges Hastie and McLaughlin in *Paramount Pictures, Inc. v. Rodney*, 3 Cir., 186 F.2d 111, 119, correctly answered this contention:

'But we do not see how the conduct of a defendant after suit has been instituted can add to the forums where "it might have been brought." In the normal meaning of words this language of Section 1404(a) directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted.' "

*Hoffman, supra*, 363 U.S. at 343, 80 S.Ct. at 1089. *Accord, Glicken v. Bradford*, 204 F.Supp. 300 (S.D.N.Y.1962); *Jaffe v. Dolan*, 264 F.Supp. 845 (E.D.N.Y.1967); *Rosen v. Savant Instruments*, 264 F.Supp. 232 (E.D. N.Y.1967).

According to the reviser's note, § 1404(a) was drafted in accord with the common law doctrine of *forum non conveniens*. *See* Reviser's Notes following 28 U.S. C.A. § 1404. And according to the Supreme Court, § 1404(a), was enacted by Congress to "relieve against what was apparently thought to be the harshness of dismissal, under the doctrine of *forum non conveniens*, of an action brought in an inconvenient one of two or more legally available forums . . . ." *Hoffman, supra*, 363 U.S. at 336, 80 S.Ct. at 1085. Nonetheless, it should be recognized that while § 1404(a) may have been intended by Congress to codify the common law of *forum non conveniens*, as Congress understood it, § 1404(a) deals only with the transfer of actions from one federal district to another federal district. Although judicial construction of that statute may be helpful in

determining the just limits of the *non conveniens* doctrine as applied to situations such as this one, § 1404(a) does not control the issue raised in this case.

Subsequent to the decision in *Hoffman*, this court had occasion to deal with the same general question, this time in a nonstatutory situation. *Silver v. Countrywide Realty, Inc.*, 39 F.R.D. 596 (S.D.N.Y.1966) (Bonsal, J.). In *Silver* the plaintiff, a Connecticut citizen and a holder of shares in Canadianwide Properties Limited, brought suit in this district on behalf of himself and all other shareholders similarly situated, charging the defendants (two American corporations; Canadianwide, a Canadian company; and various individual defendants, apparently only some of whom were American) with waste of corporate assets. The defendant thereupon moved for dismissal on *forum non conveniens* grounds, asserting that Canadianwide was a Canadian corporation, did no business in New York, and had all its books and records in Canada. Plaintiff, in opposition to the motion, argued among other things that only three of the eleven defendants could be served in Canada, while eight of the defendants could be served in New York. Three of the defendants submitted affidavits averring that if the motion were granted they would submit to service in Canada, and endeavor to cause all of the other defendants to submit as well.

This motion suffered from an obvious defect, since dismissal would leave the plaintiff remediless as to those defendants who would not agree to submit to Canadian jurisdiction. Yet in denying the motion Judge Bonsal did not rest his opinion on

that ground. Instead, relying on *Gulf Oil, Tivoli, Hoffman*, and *Glicken*, he held:

"The doctrine [of *forum non conveniens*] applies only if there is another forum in which the plaintiff could have brought the action. . . . Here, the only suggested alternative forum is Canada, and that forum was not open to the plaintiff because eight of the eleven named defendants could not be served with process there. It is immaterial that certain defendants are willing to submit to the jurisdiction of the Canadian courts. The test is whether plaintiff could have brought the action in Canada in the first instance. . . . It is clear that plaintiff could not have done so. Thus, dismissal on the ground of *forum non conveniens* cannot be sustained." 39 F.R.D. 596, 598 (S.D.N.Y.1966).

Unlike *Tivoli*, it is eminently clear in *Silver* that the consent of the defendants to jurisdiction in the foreign forum would have had no bearing on the result. But like most cases dealing with this subject, the rationale underlying the rule asserted was left unstated.

■ Plaintiff believes that *Silver* was simply a logical extension of the cases that preceded it. Again, I do not agree. As I have previously indicated, I find both *Gulf Oil* and *Tivoli* somewhat less than persuasive as to the proper rule that should be followed here. While on their face they appear to support the result in *Silver*, I do not think that would have been the case had *all* of the *Silver* defendants consented to Canadian jurisdiction over them. Furthermore, *Hoffman* and cognate cases rest on a statutory interpretation of 28 U.S.C. § 1404(a) that is not controlling here.[12]

---

**12.** In *Silver, supra*, 39 F.R.D. at 598, n.3, Judge Bonsal stated that § 1404(a) is a codification of the common law of *forum non conveniens*. It seems, *see* Reviser's Notes after 28 U.S.C.A. § 1404(a), that Congress indeed intended this to be the case.

Simply because the Congress so intended, however, does not mean that the substance of § 1404(a) actually mirrors the substance of the common law *forum non conveniens* doctrine. Nor does it necessarily follow from this that the Supreme Court's interpretation of § 1404(a) in *Hoffman, supra*, constitutes an enunciation

of the common law doctrine. Indeed, as Justice Frankfurter points out in his dissent to the *Hoffman* companion case, *Sullivan v. Behimer*, 363 U.S. 335, 351, 364, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), prior to *Hoffman* a good number of cases, including ones decided by the Supreme Court, granted dismissal on *forum non conveniens* grounds even though jurisdiction over the defendant in the alternative forum was dependent on consent. And while Justice Frankfurter's statutory argument must of course bow to the majority's, it is perhaps instructive that in discussing the limits of

That is to say, the test enunciated in *Silver* was not required by the earlier cases, and should not be extended to situations in which the doctrine of *forum non conveniens* is predicated on the consent of all defendants to the jurisdiction of the alternate forum.

■ The reasons for requiring the existence of an alternative forum before dismissal on *non conveniens* grounds is clear, and has been stated previously—dismissal without such a condition might leave the plaintiff with no place to bring a viable claim. Why an alternative forum must be one that exists independently of consent, however, is not so clear and, as far as I have discovered, has been rarely articulated. One exception to this silence is *Ferguson v. Ford Motor Co.*, 89 F.Supp. 45 (S.D.N.Y.), *appeal dismissed*, 182 F.2d 329 (2d Cir. 1950), which though it involved a 28 U.S.C. § 1404(a) question, discussed the rationale underlying such a rule:

> "The reason . . . is clear; such a stipulation in one case might be ineffective in the subsequent action in another forum, brought after dismissal of the first case. The venue in the new forum being improper as to the defendant, such defendant would not be amenable to service of process there, and the earlier stipulation would not of a certainty overcome this defect. In the event that the defendant was not available for service, the plaintiff would have to commence a new action in some place where the defendant might be found—possibly in the same forum where the first action had been dismissed. In the meantime the statute of limitations might have run. It would be improper to subject plaintiff to such uncertainties by dismissing the first action." 89 F.Supp. at 49.

■ To the extent that these fears are justified, however, it appears that they may be easily quieted. The possibility that the running of the statute of limitations may pose an obstacle to prosecution of a

claim in the alternative jurisdiction can be and is often circumvented by simply conditioning dismissal of the complaint on the waiver of such a defense in the other forum. Furthermore, it is unlikely that a defendant who has consented to the jurisdiction of an alternative forum will attempt to avoid service in that forum after dismissal in the original action has been achieved. Failure of a defendant to comply with his representation in court would be tantamount to contempt, and a defendant who acted in such a manner would be subject to serious penalty. Moreover, in dismissing an action the court could certainly condition the dismissal on the submission of the defendant to service in the alternative forum within a certain time period. In that case, if the defendant failed to make himself available for service within the prescribed time, the court would simply reassert its jurisdiction and proceed with the action in the original forum.

■ In short, it appears to me that the test enunciated in *Silver* is unnecessarily strict, and that the court has in its possession tools with which to ensure that dismissal as a *forum non conveniens* will not cause undue prejudice to the plaintiff, even though jurisdiction in the alternative forum is dependent on the defendant's consent.

My decision here is influenced in part by what I perceive to be a recent trend away from the inflexibility of *Silver*. A prime example of this may be seen in *Noto v. Cia Secula di Armamento*, 310 F.Supp. 639 (S.D.N.Y.1970) (Weinfeld, J.), a case whose facts are strikingly similar to those of this case. *Noto* arose out of the explosion of an Italian owned tanker in an Iranian port. Thirty-one crewmen died in that explosion, and the next of kin of twenty-eight of these men—all of whom, like their kin, were Italian nationals and residents—asserted a claim grounded in maritime tort. The twenty-three defendants in *Noto* were both domestic and foreign corporations, and the Iranian government. Thirteen of the de-

§ 1404(a) the *Hoffman* majority in no way addressed this point. This is some evidence, however indirect, that the boundaries of

§ 1404(a) and the common law of *forum non conveniens* are not coextensive.

fendants, all major oil companies, sought to dismiss the complaints on the same grounds raised here: failure to state a claim upon which relief can be granted, and *forum non conveniens.* Their motion was granted by Judge Weinfeld on both grounds, but only the rationale supporting the *forum non conveniens* dismissal is relevant.

In opposition to the motion to dismiss the plaintiffs argued that *forum non conveniens* could not be applied to the facts of that case, since "none of the defendants here is amenable to process in an obviously more convenient forum; nor has any defendant agreed to submit to such foreign jurisdiction." 310 F.Supp. at 648. In rejecting this argument, Judge Weinfeld observed that the doctrine of *forum non conveniens* is grounded essentially in the fact that plaintiffs' claims "have no relationship to or contact with this district, or for that matter with any jurisdiction in the United States. The hard, realistic fact is that the basic controversy is one between foreign plaintiffs on the one side and foreign corporations . . . on the other."[13] 310 F.Supp. at 649. While it is true that Judge Weinfeld's resolution of the issue of lack of an alternative forum was strongly influenced by his view that the plaintiffs' claims lacked merit, *ibid.,*[14] his opinion leaves little doubt that as he viewed it the *forum non conveniens* doctrine would have allowed the court discretion to decline jurisdiction "in the interest of justice" even if the plaintiffs' claims had been facially valid. That this is so may be seen from Judge Weinfeld's strong reliance on *Canada Malting Co. v. Paterson Steamships, Ltd.,* 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932), and

the Supreme Court's recognition there of a court's inherent power to decline jurisdiction when exceptional circumstances so require.

The opinion in *Noto* is all the more striking given the lack of consent by the defendants to the jurisdiction of any other forum. Thus, dismissal of the complaint left the plaintiffs no other forum in which to bring their claims. In this case, on the other hand, defendants have not only consented to jurisdiction in Iran, but have also evidenced a strong desire to be sued there.

█ A further indication of a trend away from *Silver* and the rigid standard enunciated there may be seen in *Grammenos v. C. M. Lemos,* 457 F.2d 1067 (2d Cir. 1972). *Grammenos* involved an action under the Jones Act and the general maritime law by two Greek seamen against a Panamanian corporation, a Liberian flagship, and a Greek citizen (allegedly an American resident and the beneficial owner of the Panamanian corporation). The plaintiffs' claims arose when they were injured after a fire broke out on their ship in Marseilles, France. The district court dismissed the complaint for lack of personal jurisdiction, and for *forum non conveniens.* This judgment was reversed on appeal, in part because the Court of Appeals found *forum non conveniens* an inappropriate ground for dismissal at that juncture of the litigation. As originally written the Court of Appeals' opinion stated in a footnote:

> "*Forum non conveniens* is not an appropriate ground for dismissal. Even though the seamen's articles specified that Greek law would cover liability under the agreement, Greek courts take jur-

---

13. I have stated earlier, *see* note 10, *supra,* that a suit by plaintiff against NIOC, IIC and IORC in Iran is not a real substitute for a suit against the eleven defendants here. Nevertheless, I think it quite clear from the complaint and the various materials submitted by plaintiff in opposition to defendants' motions that, like *Noto* at the core of this litigation is a disagreement between foreigners—plaintiff and Dr. Eghbal, the Iranian government official who by any account of what happened played a substantial role in effecting the transfer of the Pazargard shares to NIOC.

14. Plaintiff has thus attempted to distinguish *Noto* from this case on the ground that in *Noto* Judge Weinfeld found the plaintiffs' claims to be meritless. However, Judge Weinfeld's dismissal of the complaints on *forum non conveniens* principles was independent of his dismissal for failure to state a claim. *"[E]ven if plaintiffs' complaints were sufficient to withstand the motion to dismiss for failure to state a claim,* the defendants are entitled to dismissal upon the grounds of forum non conveniens." 310 F.Supp. at 647 [emphasis supplied].

isdiction of tort cases only when the ship is owned by a Greek corporation or the tort occurred in Greek waters. *See Hellenic Lines v. Rhoditis*, 412 F.2d 919, 922 n.6 (5th Cir. 1969). Neither condition was met here; therefore the seamen could sue in Greece only with Nile's consent. In *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), the Supreme Court held that a forum in which the plaintiffs could not sue as a matter of right, but in which they were dependent on the defendant's consent to proceed, was not an available forum under the doctrine of *forum non conveniens*." Footnote #5, in *Grammenos*, DCK. No. 71–1057 (2d Cir. Feb. 23, 1972).

The Court of Appeals, however, subsequently amended its opinion, and substantially modified the above footnote. The footnote now reads as follows:

"*Forum non conveniens* is not an appropriate ground for dismissal at this point. The doctrine, which 'involves the dismissal of a case because the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else . . . is quite naturally subject to careful limitation for it not only denies the plaintiff the generally accorded privilege of bringing action where he chooses, but makes it possible for him to lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate.' *All States Freight, Inc. v. Modarelli*, 196 F.2d 1010, 1011 (3d Cir. 1952); 1 Moore, Federal Practice 0.145[5]. A decision to dismiss 'presupposes at least two forums in which the defendant is amenable to process . . . [and] furnishes criteria for choice between them.' *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). The factors to be taken into consideration include those relevant to the decision on refusal to exercise subject matter jurisdiction, particularly the issue of availability of another forum, as well as other practical questions such as access to sources of proof, and convenience and cost of obtaining or compelling attendance of witnesses. *See Gkiafis v. Steamship Yiosonas*, 387 F.2d 460 (4th Cir. 1967); *Odita v. Elder Dempster Lines, Ltd.*, 286 F.Supp. 547 (S.D.N.Y.1968); *Voyiatzis v. National Shipping and Trading Corp.*, 199 F.Supp. 920 (S.D.N.Y.1961). On the issue of availability of an alternative forum, the parties may wish to introduce proof of foreign law (cf. Rule 44.1, Fed.R.Civ.P.; 5 Moore, Federal Practice, 44.1.01 [1]); normally when the plaintiff is remanded to a foreign forum, the defendant agrees on the record to submit to jurisdiction elsewhere and to post security for any judgment awarded there. *See, e.g., Garis v. Compania Maritima San Basilio*, 386 F.2d 155 (2d Cir. 1967); *Berendson v. Rederiaktiebolaget Volo*, 257 F.2d 136 (2d Cir.), cert. denied, 358 U.S. 895, 79 S.Ct. 156, 3 L.Ed.2d 121 (1958); *Lambiris v. Neptune Maritime Co.*, 38 A.D.2d 528, 326 N.Y.S.2d 862 (1st Dept. 1971)." 457 F.2d at 1074, fn. #5.

It is particularly noteworthy that in its amended footnote the Court of Appeals observed that "normally when the plaintiff is remanded to a foreign forum, the defendant agrees on the record to submit to jurisdiction elsewhere and to post security for any judgment awarded there." This statement contrasts markedly with the court's citation in its original footnote of *Hoffman's* limited definition of an "alternative" forum. In its context, this change must surely indicate that as the Court of Appeals now interprets the doctrine, the application of *forum non conveniens* is not automatically barred simply because a defendant's consent to the alternative forum is necessary; if a certainty of jurisdiction in the other forum were required before dismissal on *non conveniens* grounds, as plaintiff here contends, consent, or the lack of it, would have little relevance to the remand of a case to another forum. While it is difficult to be entirely confident of this reading of *Grammenos*, it is not to be overlooked that one other judge in this district has previously reached an identical conclusion. *Frangis-*

katos v. *Liberian M/V Konkar Pioneer*, 353 F.Supp. 402 (S.D.N.Y.1972) (MacMahon, J.).

Even if the rule might be marginally justified in the interests of protecting the rights of an American plaintiff and providing him with a local forum in which to enforce his rights, there is good reason to relax the rule when applied, unlike the case in *Silver* or *Tivoli*, to foreign plaintiffs, whose right to sue in the United States is clearly of a lesser magnitude than that of an American citizen. *See De Sairigne v. Gould*, 83 F.Supp. 270, 272 (S.D.N.Y.), aff'd 177 F.2d 515 (2d Cir. 1949), *cert. denied*, 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338 (1950); *cf. Olympic Corp. v. Societe Generale*, 462 F.2d 376 (2d Cir. 1972); *Garis v. Compania Maritima Basilio*, 386 F.2d 155 (2d Cir. 1967). Given this lesser interest, and considering the marginal justification in any case for limiting application of *forum non conveniens* to instances where the alternative jurisdiction exists independently of consent, there is little reason to extend the strict rule in *Silver* to a situation involving a foreign plaintiff.

If any instance should make this manifest, it is this one. This case involves claims by an Iranian plaintiff, based, ultimately, on an alleged contractual breach in Iran by two Iranian corporations and must be settled by application of Iranian law. The defendants have consented to jurisdiction in Iran, and there is little question that the Iranian courts will accept jurisdiction over the defendants. Furthermore, it can hardly be said to be prejudicial to require plaintiff to prosecute this lawsuit in his home forum, instead of doing so in the United States.

In sum, it is my belief that although the defendants may not be subject to Iranian jurisdiction without their consent, dismissal on *forum non conveniens* grounds is not foreclosed, at least where, as here, the plaintiff is a foreign citizen who resides in the alternative forum, and where all the defendants have consented on the record to submit to the jurisdiction of the foreign court. If for some unforeseen reason the Iranian courts will not accept jurisdiction over the defendants despite their consent, plaintiff will be able to renew prosecution of his claim in this court.

## II

An action may be dismissed on the ground of *forum non conveniens* only where the balance of the convenience of the parties and the interests of justice is strongly in favor of the defendant. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507–08, 67 S.Ct. 839, 91 S.Ct. 1055 (1947); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 450 (2d Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Vanity Fair Mills v. T. Easton Co.*, 234 F.2d 633, 645–46 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). In reaching this balance it is necessary to consider, among other factors, the ease of access to sources of proof, the availability of compulsory process over unwilling witnesses, and the cost of obtaining willing witnesses. *Gulf Oil Corp. v. Gilbert, supra*, 330 U.S. at 508, 67 S.Ct. 839. An additional factor to consider, and one particularly relevant here, is the administrative burden on a forum of resolving complex controversies that have little or no contact with the forum and which must be settled by the application of foreign law. *Ibid.; Fitzgerald v. Texaco, Inc., supra*, 521 F.2d at 450–51. As I have previously made clear to the parties, it was my initial reaction, now confirmed, that applying this balance to the facts of this case there could hardly be a stronger argument for dismissal.

As the statement of facts evidences, plaintiff's claims are based on the theory that the American defendants induced two Iranian corporations, IIC and IORC, to breach their agreements with plaintiff. Since these agreements were reached in Iran, between Iranian parties and concerning the shares of an Iranian manufacturer (Pazargard), it is clear that evidence of the breach itself—assuming that one took place—must come primarily from Iran, and the major witnesses whose testimony may be needed concerning this breach will also

most likely come from there.[15] In addition, defendants have contended that the transfer by IORC of the Pazargard shares to NIOC was *compelled* by the Iranian government; and while plaintiff alleges that IORC was merely *induced* by Iran to make the transfer, any resolution of plaintiff's claims would of necessity require first some conclusion as to the role of the Iranian government in these events. The proof as to that point, obviously, would come primarily from Iran.

Aside from these factors, which by themselves weigh heavily toward declining jurisdiction in favor of Iran, it must be recognized that the validity of plaintiff's claims must be determined under Iranian and not American law.[16] Having already had occasion in this case to examine Iranian law at least preliminarily, I know from first-hand experience what a difficult task it is to reach any conclusion as to its substance. According to plaintiff's own expert, Medhat Omidvari,

"The important thing about the Law of Iran, as regards the Civil Code and the nature of the Law, is that it was codified about 50 years ago, with due consideration to the centuries of development of the principles of Islamic Law, and borrowing from the Civil Codes of European countries. . . . Thus there exist two different sources in Iran for interpreting and applying the general principles, regarding cases: first, Islamic law, and second, European sources." Omidvari affidavit, p. 2 of translation.

Iranian law is, therefore, drawn from an entirely different base of principles than American law, and while the court certainly could, if pressed, seek to understand its essence, that would undoubtedly take an inordinate amount of time and effort. Proof that this is so is perhaps best revealed by a comparison between the law of Iran as explained by plaintiff's experts and the widely divergent reading of the same law by defendants' experts. Thus there surely can be no question that the Iranian courts are infinitely better able to tackle the legal issues raised in this case.

The above facts all strongly support a determination that this court is *forum non conveniens.* Indeed, my inclination was to grant the defendants' motion when it was originally made, on the basis of the pleaded facts. Plaintiff, however, asserted that discovery would produce evidence of a nexus between his claims and this forum sufficient to show this to be the more convenient forum, or at least convenient enough that his choice of forum should be honored. In order that plaintiff might be able to back this claim up with facts, he was allowed to go forward with discovery insofar as it re-

---

**15.** Plaintiff has asserted that he intends to call no witnesses from Iran other than himself. Even if he were to hold to this at trial, which I must admit seems quite doubtful, defendants would in all likelihood desire, with cause, to call a significant number of Iranian witnesses, both as to the law of Iran and as to what exactly transpired in the period leading up to the transfer to NIOC of the Pazargard shares.

**16.** The law is clear that in determining what law to apply, the federal court must apply the choice of law rule of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Van Dusen v. Barrack,* 376 U.S. 612, 615, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). The New York choice of law rule, whether involving torts, *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), or .involving contracts, *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954); *In re Havemeyer,* 17 N.Y.2d 216, 270 N.Y.S.2d 197, 217 N.E.2d 26 (1966), is the "grouping of contacts" or "center of gravity" rule. As stated in *Babcock,* the law that controls is that of the jurisdiction which "because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." 12 N.Y.2d at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283.

In this case there seems little doubt that Iran is the forum that has the greatest concern with the events on which plaintiff's claims are based. Not only is the company whose shares are at stake Iranian, but the parties who are said to have breached their contractual obligations are Iranian as well. On the other hand, the only factor which points at all towards an interest of any other jurisdiction in this dispute is that the defendants who allegedly interfered with plaintiff's rights are American. Surely, Iran's interest in this dispute is by far the greater, and Iranian law must control.

lated to this issue. Some nine months of discovery later, plaintiff contends that he has gained evidence to support his assertion. His argument focuses primarily on what he asserts to be the "facts" which show (1) that the defendant controlled the acts of its Iranian subsidiaries from New York and London, and (2) that New York was the locale for the consummation of the acts which caused plaintiff injury—*i.e.*, the signing of the Transfer Agreement. The case for dismissal, however, remains overwhelming. Plaintiff has uncovered little in discovery to support the first contention, and exaggerates the importance of the second.

As Judge Weinfeld stated in *Noto v. Cia Secula di Armamento, supra*, 310 F.Supp. at 647, while the plaintiff advances theories, the court must decide upon facts. Yet even after nine months of discovery, it is largely only theory advanced by plaintiff that stands as proof that defendants controlled the actions that occurred in Iran. As was the situation in *Fitzgerald v. Texaco, Inc., supra*, plaintiff wishes the court to believe that the defendants controlled the activities of their Iranian subsidiaries, and that these subsidiaries acted according to the specific dictates of their corporate superiors. However, little if any evidence that would support this contention has been presented the court. At most, all that plaintiff has demonstrated is that the defendants were aware of the struggle over the Pazargard shares in Iran, and were interested in its outcome. But the only "proof" buttressing plaintiff's claim that the defendants acted in New York to influence what occurred in Iran is the bare inference that because of the importance to defendants of these events and given the purported control by defendants of their Iranian subsidiaries, they *must* have directed their subsidiaries to act as they did.

Even if this inference is warranted, that does not reflect significantly on the choice of a convenient forum. Plaintiff has already conducted extensive discovery in the United States with the specific goal of concretizing his theory and has failed to achieve that objective. Evidence to support plaintiff's theory must, therefore, come from Iran or perhaps elsewhere outside the United States, if it is to be found anywhere. Certainly then, there is little in this contention upon which to conclude that a New York forum will make access to relevant evidence more convenient.

Another significant portion of plaintiff's argument represents an attempt to demonstrate that various actions taken in Iran were taken on behalf of the defendants. For example, plaintiff strongly emphasizes the significance of the role of one Roger Varian in the events leading to the signing of the Transfer Agreement. Varian was· a representative of Iranian Oil Participants ("IOP"), an English company whose shares are owned by the Consortium members. Plaintiff points to a number of documents as evidence that Varian represented the Consortium members: a letter attached to plaintiff's affidavit in which Varian identified himself to plaintiff as "Representative in Iran of the Consortium Members,"[17] responses by certain of the defendants to the plaintiff's first set of interrogatories,[18] and deposition testimony of Jan Pieter Van Reeven, formerly chairman of the Consortium's Iranian operating companies, including IORC.[19] Nonetheless, even if defendants can be held accountable for Varian's activities,[20] that provides little assistance in determining the proper forum. Whatever Varian did, he did in Iran or London, not in New York or elsewhere in the United States, which only serves to underline the

---

**17.** Farmanfarmaian aff., ex. 11.

**18.** *See* responses of defendants Exxon, Gulf, Mobil and Texaco to certain of plaintiff's first set of interrogatories, no. 10, dated September 30, 1976.

**19.** Van Reeven dep., p. 29.

**20.** Since Varian worked for IOP, and IOP's sole shareholders were the Consortium members, it is of course true that to some extent Varian was their representative. Nevertheless, IOP and its shareholders are separate corporate entities, and as such the extent of their liability, if any, may very well differ.

lack of contact between this forum and the relevant activities giving rise to this lawsuit.

Nor does the fact that the Transfer Agreement was signed in New York weight heavily in the forum balancing process. In the first place, other than the formal consummation of the Agreement here, most of the operations leading to approval of the Agreement took place in Iran. Secondly, the Transfer Agreement—which actually was signed by the defendants' trading subsidiaries and not the defendants themselves—on its face merely provided that IORC and NIOC, and not the defendants, would arrange for the disposal of the Pazargard shares.[21] Indeed, the Transfer Agreement did not even compel transfer of the Pazargard shares to NIOC, as plaintiff to some extent concedes when he states that at least four months after the Transfer Agreement was signed in New York, the Pazargard shares had not been transferred to NIOC and there was still a possibility that plaintiff would receive them.[22] That the New York signing of the Transfer Agreement should be of little significance on the *forum non conveniens* issue is further indicated by the fact that after nine months of discovery, plaintiff has been able to present no evidence of any direct input by the defendants in New York into the determination by IOP in London to ratify the wording of clause 8 of that agreement.[23]

Thus, while there is substantial reason to view Iran as a convenient forum for the adjudication of this suit, the only fact pointing towards New York as an appropriate forum is that the defendants are American corporations, some of whom have their headquarters in this city. However, it seems clear to me that if plaintiff is going to be able to prove his claims, the great bulk of his proof will have to come from Iran, and that plaintiff's case will have to rely heavily on the knowledge of individuals in that country who participated in the events leading to NIOC's purchase of the shares. Yet this court has no subpoena power over any of these people. *See Fitzgerald v. Texaco, Inc., supra*, 521 F.2d at 451. Furthermore, prosecution of this case here would constitute an unacceptable burden on this court, adding to an already overburdened docket a complex case of potentially huge proportions but with insignificant connection to matters of local interest.

Numerous decisions in this circuit support the conclusion that this court is *forum non conveniens*. In *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448 (2d Cir. 1975), for example, a vessel owned by Texpan, one of Texaco's foreign subsidiaries, sank in the Dover Straits, off the English coast. Texaco Overseas Tankships, Ltd. ("TOT"), a British corporation, hired another company to mark the ship's position to prevent an accident, but that company apparently mismarked the position, and an accident between the Texpan ship and a German vessel ensued. Thereupon, suits were brought against Texaco, Inc. in this district by the estates of twelve deceased German seamen and by several foreign corporations, who contended that Texaco, having supervised the marking operation from New York was responsible for the mismarking of the Texpan ship's position. Texaco moved to dismiss the complaint on *forum non conveniens* grounds, which motion was granted by the district court.

On appeal, the circuit court affirmed, finding, as here, that the evidence of Texaco's supervision from New York was weak, and that the best proof in support of plaintiffs' claims would undoubtedly come from England, where Texpan and TOT are located and where Texaco does business. The court also found that it would be considerably easier and less expensive to obtain the appearance of witnesses in England, and that the district court had no subpoena

---

21. Clause 8 of the Transfer Agreement states: "Arrangements for the disposal of the shares in Pazargard Chemical Company will be subject to agreement between NIOC and IORC."

22. *See* Pl's Supplemental Brief at 33.

23. It was apparently in London at a meeting of IOP that agreement was first reached as to the wording that would later be incorporated in clause 8 of the Transfer Agreement.

power over most of the potential witnesses. Additionally, the court in affirming the dismissal gave considerable weight to the lack of any substantial contact between the dispute and New York, and to the administrative burden that the action, surely less complex than here, would place on the district court. The parallels between these findings and the findings of this court in this case are obvious, and clearly supportive of dismissal here.[24]

In another comparable case, *Mohr v. Allen,* 407 F.Supp. 483 (S.D.N.Y.1976), the plaintiff was a non-resident American citizen, and was suing a New York resident on the basis of several alleged joint venture agreements involving a Mexican Hotel project and two boats. Plaintiff alleged that the defendant had failed to live up to certain obligations of these agreements. Judge Pollack, however, dismissed the complaint for lack of jurisdiction and, alternatively, on the ground of *forum non conveniens.* In respect of the latter ground, Judge Pollack wrote:

> "There can be little doubt that this dispute with its clear Mexican locus, complexities and contacts, should be resolved in Mexico in the interests of fairness and justice.
>
> \*   \*   \*   \*   \*   \*
>
> Because of the absence of any writing to demonstrate the existence of the joint ventures he alleges, plaintiff will be required to show at the trial of his claims that a finding of such joint ventures is justified by his actions and his relationship with the defendant. Those actions occurred and that relationship was pursued almost entirely in Mexico.
>
> In addition the subject matter of the dispute is in Mexico." 407 F.Supp. at 488–89.

In summation, the court found:

> "The nature of the claims, their locus or origin, the factors of convenience, the availability of compulsory process and the application of foreign property law that may come into play in this case clearly outweigh the presumption in favor of plaintiff's choice of forum." *Id.* at 489.

All of these factors are present here and sustain dismissal of the complaint. In addition, this case involves the claim of a foreign plaintiff, whose choice of forum should be given less weight than the choice of an American plaintiff, albeit a non-resident such as *Mohr. See Olympic Corp. v. Societe Generale,* 462 F.2d 376 (2d Cir. 1972); *Garis v. Compania Maritima Basilio,* 386 F.2d 155 (2d Cir. 1967). *See also Fitzgerald v. Texaco, Inc., supra,* 521 F.2d at 450–51.

Finally, in *Refining Associates Canada, Ltd. v. Mobil Oil Indonesia, Inc.,* unreported, 75 Civ. 443 (HFW) (S.D.N.Y. September 8, 1975), a case almost on all fours with this one, Judge Werker dismissed the complaint on *forum non conveniens* grounds. Plaintiff in *Refining Associates* was a Bermuda corporation with its principal place of business in Hong Kong. It alleged among other things that defendants Mobil Oil Indonesia, Inc., a Delaware corporation with its principal place of business in Indonesia, and Mobil Oil Corporation, also a Delaware corporation but with New York City its principal place of business, failed to live up to the obligations imposed on them by a contract negotiated mostly in the United States though signed in Bermuda. The contract concerned mining rights in Indonesia. Judge Werker, citing *Fitzgerald v. Texaco, Inc., supra,* and looking to those factors first identified by the Supreme Court in *Gulf Oil, supra,* granted defendants' motion to dismiss on *forum non conveniens* grounds. Judge Werker noted particularly that to try the case here would raise the serious problem of interpreting Indonesian law; that Indonesia, not New York, was the center of the basic dispute; that the court could not compel the production of relevant witnesses and documents located

---

**24.** In his dissent in *Fitzgerald,* Judge Oakes emphasized the ease of travel in a jet age and the fact that the accident occurred in international waters. It was his belief that when these factors were accorded their proper weight, the balance of convenience was tilted no more towards London than New York. Even under Judge Oakes' analysis, however, the facts of this case are such as to point clearly to Iran as the more convenient forum.

in Indonesia, and that it would be extremely expensive in any case for the defendants to produce them in New York; and that a third-party from Indonesia not amenable to suit in New York or elsewhere in the United States was directly involved in the underlying contractual issue. All these considerations are just as relevant in this case as they were in *Refining Associates* and all support the refusal of the court in this case to retain jurisdiction.

In sum, dismissal of the complaint on the ground of *forum non conveniens* is clearly warranted. This case involves an Iranian plaintiff, the actions of several Iranian corporations in Iran, and the sale of shares of an Iranian corporation. The only factor which lends support at all to the choice of this forum is the fact that the defendants are Americans, but the plaintiff after a significant amount of discovery has been unable to come forward with anything of substance to show that the defendants took any significant actions either in New York or elsewhere in the United States that would indicate the appropriateness of this forum. Iran, on the other hand, is intimately related with both the factual and legal issues raised in this case, and is surely the more convenient forum.

Accordingly, the complaint is dismissed. This dismissal is conditioned on two requisites: (1) that the defendants waive any defense that they might have relating to any statute of limitations that did not exist prior to the initiation of suit in this district; (2) that the defendants consent to the jurisdiction of the Iranian courts, and that they submit to service of process in Iran, which shall take place within 90 days from the filing of this opinion.

IT IS SO ORDERED.